# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## W. A. HORNER v. MILES T. HOLT.

April 26, 1948.

Record No. 3314.

Present, All the Justices.

The opinion states the case.

*George E. Allen* and *William Old,* for the plaintiff in error.

*Denny, Valentine & Davenport* and *R. Westwood Winfree*, for the defendant in error.

MILLER, J., delivered the opinion of the court.

This action was instituted by Miles T. Holt, hereinafter called plaintiff, against W. A. Horner and Thomas G. Burch, for damages for alleged breach of contract. The first trial held on November 20, 1946, resulted in a mistrial. During the second trial on the 19th and 20th of February, 1947, the cause was nonsuited as to the defendant Burch. A verdict of $1,200 was returned against W. A. Horner, hereinafter referred to as defendant, and judgment entered thereon.

There are eleven assignments of error. To be better understood, they may be consolidated and set forth as follows: Defendant contends that,—

1. He never became a party to the alleged written contract by executing it personally or by agent, nor did he by his conduct acquiesce in or ratify the same.

2. The plans and specifications mentioned in the contract are not sufficiently identified as a part thereof and cannot be incorporated therein by parol testimony.

3. If such contract was entered into between the parties and breached by the defendant, the measure of damages is the sum paid thereon, with interest, and as that was returned by tender into court about a month before this trial, plaintiff can recover no other damages.

In 1945, defendant purchased a tract of land in Chesterfield county. To dispose of this property advantageously, he laid out streets and divided and platted it into lots. He named the subdivision "Chesterfield Court" and selected Thomas G. Burch as his exclusive broker, or agent, to handle the property. To further the development and sales, Burch erected thereon a sign board on which was prominently written, "See Thomas G. Burch, Agent for W. A. Horner." It was still upon the property November 20, 1946, when the first trial of this case began. On two or

more days in January, 1946, and on several days in February, 1946, the following advertisement appeared in a Richmond newspaper under the heading, "Houses for Sale":

"Chesterfield Court—In Chesterfield County at Branch's Church on Broad Rock Road. Large Building sites. See plans and specifications of 6-room and bath, modern brick homes we are building. Financed. W. A. Horner, developer, Thomas G. Burch, agent, broker, 1202 Hull St., 3-3425."

On February 17, 1946, there appeared in the same newspaper a display advertisement beginning with this sentence: "This is a description of the houses we are building in Chesterfield Court for veterans." It concluded in bold type as follows: "W. A. Horner, owner and builder, Thomas G. Burch, broker agent." There is testimony from Burch that defendant asked a day or so after this last mentioned advertisement appeared that no more advertisements be put "in with his name."

A special bank account was set up in the name of "Chesterfield Court, W. A. Horner." Burch was authorized and directed to deposit all money received from sales of lots—or lots and houses—in this account. During January, February and March, 1946, twenty-five deposits were made therein by Burch. They represented payments made on sales of lots, and on applications or contracts identical to the one sued on by plaintiff. Defendant was the only one allowed to check on this account, and in these three months, he drew fifty-five checks. The average balance in this account over this period of time was approximately $5,000. The defendant was familiar with the number and amount of deposits made and other details for he or his wife secured monthly statements from the bank from January, 1946, to June, 1946, both inclusive.

During the late winter of 1945 and early 1946, defendant undertook the construction of several houses on the lots in this subdivision. He supplied his agent, Burch, with a set of plans and specifications of the houses he proposed to build. The first contract for sale of a lot and house to be

erected thereon was negotiated by Burch on December 27, 1945. It was identical in form with that entered into with plaintiff, except defendant actually signed the first contract. Thereafter Burch and W. Smith Williams, Jr., a salesman in his office, continued to secure these written applications or contracts for sale of lots and houses thereon from prospective purchasers. These and the contracts for sale of vacant lots were kept in folders in a file in Burch's office. They were available to defendant for inspection at any time and were examined or looked over by him about twice a week from February 1, 1946, through April of that year. In February, 1946, the defendant was specifically informed by his agent, Burch, that he, Burch, had secured about thirty contracts for sale of lots with houses to be constructed thereon. In April, defendant informed Burch to take no more contracts like these. Over a period of a few months, actually thirty-three applications or contracts, including plaintiff's, were negotiated by Burch and his salesman, Williams, and signed by one or the other of them as was plaintiff's. Nine houses were built upon lots in this subdivision and disposed of to the parties who had signed such writings.

The defendant contends that he did not erect the last eight houses in reliance upon the applications or contracts negotiated by Burch, but that in every case he entered into his own negotiations with the prospective purchaser after the written application had been received and put in the file by his agent, Burch. Therefore he says he received the benefit of such contracts and recognized that the prospective purchasers who had signed such applications were legally bound if and when he elected to avail himself of his rights thereunder, but that he was not bound thereby as he did not personally execute the same, but merely entered into subsequent oral understandings or agreements with the prospective purchasers and built the several houses pursuant to this subsequent or supplementary agreement.

This conduct relied on by defendant, whereby he sought to avail himself of the benefits of these written instruments

without being legally obligated, is definitely contradicted. The purchaser of one lot with a house to be erected thereon testified that he signed his contract, or application, on January 29, 1946, and paid $250; that shortly thereafter he left Richmond and did not return until March; that after his return he saw and talked to the defendant for the first time about his house. He said it was then actually under construction—"the walls were maybe six feet high at that time."

On February 1, 1946, plaintiff read the classified advertisement in the newspaper. On the next day he called Mr. Burch at his office, talked with him, and was shown the plans and specifications for the house. Later that day, W. Smith Williams, Jr., the agent in Burch's office, went with plaintiff and his wife to Chesterfield Court. While there Williams showed the numerous lots and exhibited and discussed the plans, specifications and blueprints for erection of a house on such lot as might be selected. The plaintiff desired to purchase lot 52, and the contract was filled out and signed by Miles T. Holt and wife. On the left side, near the bottom, opposite the word "Test" appears the signature of W. Smith Williams, Jr. Two hundred and fifty dollars was paid by the plaintiff at that time. It was deposited by Burch in the Chesterfield Court account. The contract signed that day is as follows:—

"MEMORANDUM OF AGREEMENT

"Made this 2 day of February, 1946, between Thomas G. Burch, Agent for W. A. Horner of the first part, and Miles T. Holt, party of the second part.

"WITNESSETH: That the said part of the first part do bargain and sell to the said party of the second part, or assigns, the following property, to wit: Lot #52 Chesterfield Courts, improvements thereon, Chesterfield County, Virginia, one brick house according to plans and specifications. For the Sum of Eight Thousand and five hundred dollars payable as follows, to-wit: All Cash Dollars, Cash residue in providing a G. I. loan can be obtained. Negotiable

notes to be given for the deferred payments, and secured by deed of trust on the property. Terms of sale to be complied with within 30 days: a deed of GENERAL WARRANTY to be executed and delivered by said part of the first part to said part of second part, the said part of the second part Covenant to accept and comply with the terms of said sale herein set forth, provided the title thereto be good, and

(Paid)

doth pay the SUM of Two hundred and fifty dollars, the receipt whereof is hereby acknowledged to bind said sale, which sum shall be refunded if the title is not good as aforesaid, legal possession of said property to be given from date of sale, actual possession subject to lease of present tenant. Interest, Taxes, Insurance and rents to be prorated from xxxxxxxxxxxxx date of settlement.

"Regular commission allowed as fixed by Richmond Real Estate Exchange to be paid by part 1st of part.

"Witness the following signatures:

| | | |
|---|---|---|
| "MILES T. HOLT | (Seal) |
| "LOUISE H. HOLT | (Seal) |
| " | (Seal) |
| " | (Seal) |

"Test)    W. SMITH WILLIAMS, JR.
"Test)
"3514 Decater"

Plaintiff was advised by Smith that a copy would be mailed to him on Monday. He desired to apply promptly for the G. I. loan but did not receive his copy on February 4th. He had then decided to pay an additional $750 within 30 days so as to make a total payment of $1,000 within that period of time. Therefore, on February 5, he went to Burch's office, was given a typewritten copy of the contract by Burch who marked out the "Two hundred and fifty dollars" that appears in the body of the instrument and wrote "One thousand dollars" in place thereof. He also wrote in just above the signatures of the plaintiff and his wife, "$250 pd.—Bal of $1000—30 days." This copy of the

application or contract, so amended and supplemented, was delivered to plaintiff, along with copies of the plans and specifications mentioned therein. These were taken to the First Federal Savings and Loan Association and application for a loan made, and the fee for the appraisal paid. In due time the loan was approved and plaintiff so notified. About a week later, on written request from Burch, plaintiff called at his office and secured an application for priority on his building material. On March 2, 1946, plaintiff again went to Burch's office and paid by check the sum of $750, this being the balance of the $1,000 mentioned in the interlineation made on the contract on February 5th. This check, as well as that for $250, was endorsed by Burch and duly deposited in the account of "Chesterfield Court, W. A. Horner." At this time, that is on March 2, 1946, Burch was asked by plaintiff to *sign his copy of the contract*. In compliance with this request, he signed the same in the left lower corner across the typewritten name of W. Smith Williams, Jr., as follows: "T. G. Burch, Pd. in all $1000, 3/2/46."

Thereafter at intervals of about two weeks, plaintiff went to see Burch to ask when the erection of the residence would be started. On his first trip he was told that he was the ninth who had bought and materials were on hand for the first ten houses, and that he had nothing to worry about and "would definitely get his house." On subsequent visits, excuses, such as bad weather or lack of workmen, were made for not having begun the erection of the building. Finally in June, plaintiff demanded to know when work on the house would actually begin, but Burch, being unable to say, advised plaintiff that he "would talk to Mr. Horner that afternoon and would call me back." He did not call and shortly thereafter plaintiff personally called the defendant. His testimony relative to that is as follows:

"A. I asked Mr. Horner could he give me an approximate date and he said he couldn't build the house at all under the present prices of material. I said, 'You might

as well tell me you won't build at all.' He said, 'No', but at the present price of material he couldn't, that he would have to wait until materials dropped, and then I entered suit.

"Q. Did Mr. Horner tell you at that time you didn't have a contract with him?

"A. No, sir."

Plaintiff says this is the first time he talked to the defendant about the matter. However, the defendant testified that plaintiff called him in March instead of June and that he then learned that plaintiff had executed one of the applications or contracts and plaintiff told him "that he made a deposit with Mr. Burch, with Mr. Burch as my agent for $1000." On the next day he ascertained that this $1,000 was actually then in his Chesterfield Court account, but no return of this money was made to the plaintiff until the tender in court on January 21, 1947, though defendant does say that he told the plaintiff "if Mr. Burch had a $1000 he could rest assured he would refund it."

We are of opinion that the above evidence is ample to establish that the defendant actually authorized his agent Burch to procure and effect sales of these lots with residence to be erected thereon and to receive payments therefor. If such authority had not been expressly given, he had, over a period of time, with knowledge of what was being done, so fully acquiesced therein as to in fact authorize these sales to be made and contracts executed in his behalf. *Yerby* v. *Grigsby*, 9 Leigh (36 Va.) 387; *Creech* v. *Massachusetts Bonding, etc., Co.*, 160 Va. 567, 169 S. E. 545; *Grace Securities Corp.* v. *Roberts*, 158 Va. 792, 164 S. E. 700, and Restatement of Agency, Vol. 1, sec. 43, p. 102.

The signature of defendant's agent, Thomas G. Burch, made on the contract March 2, 1946, meets the provisions of the statute of frauds for sale of real estate which requires that "* * * some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent, * * *." *Yerby* v. *Grigsby, supra;* *Smith* v. *Jones*, 7 Leigh (34 Va. ) 165, 30 Am. Dec. 498, and Restatement of Contracts, Vol. 1, sec. 207, p. 278.

In *Chesapeake, etc., R. Co.* v. *Williams Slate Co.*, 143 Va. 722, at p. 737, 129 S. E. 499, in speaking of when signing by an agent meets the requirements of the statute of frauds, the following is said:

"Having previously reached the conclusion that a duly authorized memorandum of the agreement had been signed by the agent of appellant or its predecessor in title, received by appellee, approved and acted upon by all parties, we think the case is not within the statute of frauds."

This signing so made and executed by defendant's agent measures up to the conditions laid down in Restatement of Contracts, *supra*, wherein it is said:

"A memorandum, in order to make enforceable a contract within the Statute, may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty,

"(a) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, and

"(b) the land, goods or other subject-matter to which the contract relates, and

"(c) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made."

Defendant, however, contends that this signature made by his agent Burch, though actually upon the copy of the contract held by the plaintiff was merely for the purpose of receipting for the money paid. A sufficient factual answer to that contention is found in the testimony of the plaintiff wherein he stated: "I asked Mr. Burch to sign my copy and he signed it." But whether he signed it with the thought of actually executing the instrument, i. e., becoming a party thereto on behalf of his principal, or merely to receipt for the $750 then paid to him as the agent of the defendant, and in furtherance of the contract, and which money was thereafter deposited to defendant's account and retained by him for many months, is immaterial.

In 49 Am. Jur., Statute of Frauds, Signature, sec. 381, p. 683, we find:

■ "Generally speaking, the purpose with which a memorandum is prepared is immaterial, and it will suffice although it was not intended to evidence the contract or to comply with the statute. If there is a memorandum, otherwise sufficient, it is not necessary that it be signed by the party to be charged with the intent to comply with the statute. His intention in this respect is immaterial. This principle is well recognized, and such cases as are contrary in result appear to have been determined with reference to particular circumstances. However, by the clear weight of authority, the signature must be made or adopted with the declared or apparent intent of authenticating the writing relied upon as a memorandum, and not by way of mere recital or indentification."

This signature was made by an authorized agent to authenticate and to receipt for money paid on that contract—hence it complies with the provisions of the statute of frauds.

It is contended that though it be established that the contract was signed by defendant's agent in such a manner as to meet the requirements of the statute of frauds, there is no sufficient identification of the plans and specifications to make them a part of the contract and such may not be done by parol testimony.

From an examination of the record, it appears that this objection was not made until after verdict. The trial court said:

"The Court further stated as to the last point raised by Mr. Allen, which point related to the plans and specifications being a necessary part of the contract and not being of themselves identifiable with it, this was the first time during the trial that point had been made and pressed and that it accordingly was not timely."

Counsel insist that sufficient objection was made when the writing of February 2, 1946, was offered in evidence.

We do not think so. That objection was specifically directed to the written contract and the signatures thereto. It is as follows:

"Q. Will you look at that and see if that is the contract you and Mrs. Holt and Mr. Williams signed on Saturday afternoon?

"A. Yes.

"Mr. Allen: We have no objection to the question being asked about the contract but object to its being formally introduced until it is first shown Mr. Burch signed the contract for the purpose of authenticating it and had authority to bind Mr. Horner.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

Mr. Allen: May we state our objection and exception to the introduction of the paper until it is shown that the signature of Thomas G. Burch was placed there for the purpose of the instrument either binding themselves or Mr. Horner and until it is shown that the parties whose names appear in the left-hand corner had authority to bind Mr. Horner."

It is clear that no objection was made to the introduction of the plans and specifications. They were identified by the plaintiff and introduced in evidence, without objection, as follows:

"Q. Did you get the plans and specifications at that time?

"A. Yes.

"Q. Who gave them to you?

"A. Mr. Burch.

"Q. I show you certain plans and ask if that is the plan Mr. Burch gave you on February 5th?

"A. Yes, sir.

"Q. Whose name appears in the lower right-hand corner of those?

"A. W. A. Horner.

"Q. I show you a set of specifications and ask you if they are the specifications given you by Mr. Burch on February 5th?

"A. Yes, sir.

"Q. Did you take these to the First Federal Savings and Loan Association—

"A. Yes.

"Q. (Continued) And apply for your GI loan?

"A. Yes.

"Mr. Davenport: I offer these in evidence as Plaintiff's Exhibits Nos. D. and E.

"Note: Said plans and specifications were at this time marked Plaintiff's Exhibits Nos. D and E by the reporter."

At the conclusion of the evidence when motion was made to strike the same, no suggestion was offered that the plans and specifications were not a part of the contract.

Timely objection to the introduction of this evidence was not made as required by Rule 22 of this court, hence such objection will not now be entertained. In the recent case of *Solomon* v. *Atlantic Coast Line R. Co., ante,* p. 240, 46 S. E. (2d) 369, it is said:

"We have held repeatedly that this is a salutary rule and requires that the ground of objection be stated with reasonable certainty in the trial court."

This brings us to a consideration of what is the measure of damages for breach of this contract. Defendant insists that it is limited to the sum paid, with interest. He relies upon the general rule set forth in such cases as *Boston* v. *De Jarnette,* 153 Va. 591, 151 S. E. 146; *Matthews* v. *LaPrade,* 130 Va. 408, 107 S. E. 795; *Stuart* v. *Pennis,* 100 Va. 612, 42 S. E. 667; *Roller* v. *Effinger,* 88 Va. 641, 14 S. E. 337; *Conrad* v. *Effinger,* 87 Va. 59, 12 S. E. 2, 24 Am. St. Rep. 646; *Abernathy* v. *Phillips,* 82 Va. 769, 1 S. E. 113, and *Sheffey* v. *Gardiner,* 79 Va. 313.

This principle was first announced about 1776 in the English case of *Flureau* v. *Thornhill,* 2 W. Blacks, 1078. Even then an exception was recognized where there was fraud or collusion on the part of the vendor.

The reasons for this rule are expressed in *Click* v. *Green,* 77 Va. 827. There it is discussed with relation to an attempt to recover damages for increased value of the land between the time it was purchased and the time of vendee's

eviction. The vendor had acted in entire good faith and was unaware of the defect in the title at the time of its warranty. Damages for such increased value were disallowed. See also, *Crenshaw* v. *Williams*, 191 Ky. 559, 231 S. W. 45, 48 A. L. R. 5, and notes at pp. 19, 24, 51, and *Seidlek* v. *Bradley*, 293 Pa. 379, 142 A. 914, 68 A. L. R. 134.

The exceptions are as broad and inclusive as the rule itself. They are expressed in the following cases and authorities: *Spruill* v. *Shirley*, 182 Va. 342, 28 S. E. (2d) 705; *Matthews* v. *LaPrade*, 144 Va. 795, 130 S. E. 788; *Greer* v. *Doriot*, 137 Va. 589, 120 S. E. 291; *Davis* v. *Beury*, 134 Va. 322, 114 S. E. 773, 115 S. E. 527; *Mullen* v. *Cook*, 69 W. Va. 456, 71 S. E. 566; Sutherland on Damages, 4th Ed., sec. 581, and Maupin on Marketable Title to Real Estate, 3rd Ed., secs. 90, 91 and 97. Among recognized exceptions is the wilful neglect or refusal of the vendor to comply. In *Davis* v. *Beury*, *supra*, at p. 344, it is said:

"* * * or if he has title and refuses to convey, or disables himself from doing so by conveyance to another person—in all such cases he is beyond the reason of the principle of *Flureau* v. *Thornhill*, *supra*, and is liable to full compensatory damages, including those for the loss of the bargain."

In *Spruill* v. *Shirley*, *supra*, Justice Spratley said: "* * * There was no fraud on the part of Spruill, either alleged or proved, nor any indication that he voluntarily disabled himself from making the conveyance."

■ In view of the above authorities, it may be said that when the vendor has acted in good faith and believed at the time of the execution of the contract that he had marketable title and could then comply and the breach is due to no wilful neglect or refusal, self-imposed inability, fraud or collusion, but to circumstances beyond the control of the vendor, such as a defect in the title unknown to the vendor, then the vendee is limited to recovery of what has been paid on the contract, with interest thereon, and

any special damages incurred in reliance on and further-ance of the contract. However, under these circumstances he cannot recover the enhanced value of the land between the date of the contract and its breach—for the loss of his bargain.

The evidence in the case at bar clearly proved that subsequent to the execution of the contract, which called for erection of a residence according to plans and specifi-cations, the cost of building materially increased. At the time the breach occurred, it had increased on this house to $1,200, the amount of the verdict, or more. The testimony discloses that nine houses were erected and materials were on hand to erect the tenth. Plaintiff was told that he held contract number nine and need have no concern about securing the erection of his home. It is obvious that the damages awarded by the jury are attributable to the wilful refusal to build according to defendant's undertaking which ultimately resulted in breach of the contract. This non-compliance was deliberate and intentional. Compliance with the contract in all particulars could have been had but defendant elected otherwise because the costs of mate-rials and labor had increased. This case clearly falls with-in the exceptions to the general rule relied on by the defend-ant.

The judgment of the trial court is affirmed.

*Affirmed.*