**In re JAMES R. CORBITT CO., Debtor.**

**Bankruptcy No. 81–00323–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

May 6, 1985.

See also, Bkrtcy., 20 B.R. 460.

---

John W. Guinee, Jr., Reston, Va., Trustee.

Stephen E. Leach, Washington, D.C., for trustee.

John J. Czyzewski, Vienna, Va., for Area Consultants, Inc.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

The debtor was a residential builder. At issue are three claims arising out of contracts for new homes for which the debtor collected deposits from the purchasers but never completed the houses.

Following the filing by the debtor of a voluntary petition under Chapter 11 of Title 11 of the United States Code (hereafter the "Bankruptcy Code"), three couples who had contracted to purchase houses and had paid deposits executed agreements assigning to Area Consultants, Inc. (hereafter "ACI") their claims against the debtor.

As filed by ACI each claim has two (2) parts, "Claim A" for earnest money deposited but not returned, and "Claim B" for breach of contract damages based on the debtor's failure to construct and convey the house. The claims assert further that each of the purchasers is entitled to the $900.00 customer deposit priority provided in section 507(a)(5) of the Code under the "Claim A" or unreturned deposit portion of each claim.[1] All three claims involve contracts signed by both husband and wife, and the priority, accordingly, is asserted as to both spouses for a total of six priority claims.

The trustee has objected to both the "A" and "B" portions of the claims on several grounds. Regarding the claim for priority,

---

1. This case is controlled by the provisions of the Bankruptcy Code as they existed at the time the case was filed, March 19, 1981. Section 507(a)(5) was re-numbered section 507(a)(6) but otherwise unchanged by the Bankruptcy Amendments and Federal Judgeship Act of 1984. References in this opinion to the consumer deposit priority will identify the section as section 507(a)(5).

the trustee argues that, at most, each claim should be accorded only a single $900.00 priority because in each case there was only one agreement and one deposit made, for the purchase of a single house.[2] The trustee argues further that the priority claims should be denied in their entirety because the legislative history of section 507(a)(5) indicates a congressional intent to limit the priority to deposits placed with retail merchants. The trustee objects to the breach of contract claims on the grounds that such claims, for damages based on loss of the benefit of the bargain, are barred by the express language of the contract, barred under Virginia law, and, further, that any damages thereunder are too hypothetical and speculative to support an award.

*Priority Claims for Customer Deposits*

Section 507 of the Bankruptcy Code provides as follows:

> (a) The following expenses and claims have priority in the following order:
>
> (5) Fifth, allowed unsecured claims of individuals, to the extent of $900 for each individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(5).

There is nothing in this statutory language to support the trustee's contention that only one $900.00 priority should be awarded for each claim here. It is axiomatic that words used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary. *Burns v. Alcala*, 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975). The trustee has offered no persuasive reason for affording to the word "individual" as used in section 507(a)(5) any meaning other than the ordinary one.

The Court has found only one case concerning section 507(a)(5) in which the construction of the word "individual" was at issue. In that case, the court ruled that the priority is not available to corporations or partnerships even when those entities had made deposits under circumstances which, absent the use of the word "individual" in the statute, would have qualified the payors for the priority. *In re Carolina Sales Corp.*, 43 B.R. 596 (Bankr.E.D. N.C.1984).

In the instant case each of the contracts was signed by both husband and wife. If the debtor had completed the house, each spouse would have been equally liable for consummating the purchase and each would have owned an undivided, but alienable, one-half interest in the property. This Court can find no reason to attribute to the word "individual" any meaning other than the commonly understood meaning of one natural person. Congress could have limited married couples to one priority claim but did not do so.

The trustee's argument that the legislative history of section 507(a)(5) demonstrates congressional intent to restrict application of the section to consumer transactions with retail merchants is unpersuasive. The section as enacted contains no such restriction. *In re Carolina Sales Corp., supra*, 597. Indeed, the section specifically includes a deposit for "the purchase of services" within the grant of priority. The legislative history, moreover, mentions service contracts, contracts for lessons, and contracts for gym memberships along with transactions with "retail merchants" as representative examples of situations in which the priority would apply. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 188 (1977), U.S.Code Cong. & Admin.

---

**2.** The trustee states that he has paid ACI $900.00 in behalf of each of the three claims, for a total of $2,700.00. ACI acknowledges receipt of payment on behalf of the claims of purchasers Patricia and John Boyer and Una and Kevin Mahar only, for a total of $1,800.00. ACI does not acknowledge receipt of any payment on behalf of the claim of purchasers Sally and John Powell.

News 1978, 5787, 6148.[3] There is nothing in the language of section 507(a)(5) or its legislative history which indicates any intent to exclude from the priority a consumer purchase of residential real property. The prospective home buyer is usually inexperienced and unable or unlikely to obtain a credit history of the developers or bargain for special terms. A home certainly is purchased for personal and family use. Allowance of the priority here would be entirely consistent with congressional intent.

The few Courts that have considered the issues raised by the trustee have ruled consistently in favor of individual consumers as that term is commonly understood, and equally consistently have ruled against corporations, banks or other business entities attempting to assert the priority. *Matter of CSY Yacht Corporation,* 34 B.R. 215 (Bankr.M.D.Fla.1983); *In re P.J. Nee Company,* 36 B.R. 609 (Bankr.D.Md.1983); *In re Carolina Sales Corp., supra.*

Accordingly, the objections of the trustee to section 507(a)(5) priority status for the "Claim A" portions of Claims No. 84, 85 and 86 in this case are overruled and the $900.00 consumer deposit priority will be allowed on behalf of each of the following: John P. Boyer, Patricia A. Boyer, Kevin J. Mahar, Una L. Mahar, John McC. Powell and Sally Anne M. Powell.

*Breach of Contract Damage Claims*

Part B or "Claim B" of each of the claims at issue is a claim for damages based upon the debtor's failure to construct and convey a house to the purchasers. In each claim, the amount demanded is the difference between the contract price and the alleged reproduction cost, as shown in appraisals made as of July 1 and September 21, 1981, less the deposit paid.

It appears that ACI ordered the appraisals to be made as of the summer of 1981 in order to coincide with the time ACI believed that breach of the contracts occurred. This apparently was the time when the prospective purchasers concluded that the debtor was unwilling or unable to build the houses.

The contracts between the debtor and these purchasers were executory contracts. As such, the effective date of any breach is controlled by the provisions of section 365 of the Bankruptcy Code.[4] The debtor originally filed a petition under Chapter 11 on March 19, 1981 and converted to Chapter 7 on January 19, 1983. Section 348, accordingly, must be read together with section 365 to determine the effective date of the debtor's breach.

Section 365(d)(2) provides:

(2) In a case under chapter 9, 11, or 13 of this title, the trustee may assume or reject an executory contract or unexpired

---

**3.** "[a] consumer that pays money on a lay-away plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or a gym membership, is a general unsecured creditor of the business to which he has given his money. Very few consumers are aware of their status as general unsecured creditors. If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag. Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors. Because of his ignorance and his inability to bargain with a retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. A recent example is the W.T. Grant bankruptcy. All customers who held "Grant's script" have essentially lost their deposits.

"In order to remedy this problem and to reorganize [sic] the position of consumer creditors as different from that of business creditors, the bill provides a priority for consumer creditors of a bankrupt business."
H.R.Rep. No. 595, 95th Cong., 1st Sess. 188 (1977), U.S.Code Cong. & Admin.News 1978, 6148, 6149.

**4.** Section 365 was substantially altered by the Bankruptcy Amendments and Federal Judgeship Act of 1984. The amendments to Section 365, which took effect October 8, 1984, were aimed generally at protecting the interests of purchasers of "timeshare" units. The Bankruptcy Code as it was in effect prior to the enactment of the 1984 Act is the law applicable to this case. Section numbers herein refer to the pre-amendment section numbers.

lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2). No plan of reorganization ever was confirmed and the trustee never expressly assumed or rejected the contracts at issue during the Chapter 11 phase of this case. The purchasers, for their part, never requested the Court to order the trustee to act.

Conversion of this case to Chapter 7 triggered the operation of section 365(d)(1) which provides, in pertinent part, "[i]n a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of the debtor within 60 days after the order for relief ... then such contract or lease is deemed rejected." 11 U.S.C. § 365(d)(1). Section 348(c) provides that, for purposes of assuming or rejecting an executory contract, the date of conversion functions as the date of the order for relief, and the 60-day period runs from the date of conversion. 11 U.S.C. § 348(c).[5]

In this case the trustee did not act to assume or reject the contracts within sixty days of the conversion to Chapter 7 on January 19, 1983, and said contracts thus were deemed rejected by operation of law on March 20, 1983.

Section 365(g) provides that rejection of an executory contract constitutes a breach of said contract and, further, that the effective date of said breach for a contract which never has been assumed shall be "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g), (g)(1). Breach of the contracts here thus is

deemed to have occurred two years earlier, on March 18, 1981.[6]

ACI, as assignee of the potential purchasers, seeks damages for the loss of the bargains made with the debtor. Initially the trustee objects on grounds that the purchasers waived their right to any recovery beyond refund of payments made when they executed the contracts, all of which contained the following language:

9. In the event that SELLER shall determine, in good faith, and for reasons beyond its control including any cause specified in Paragraph 4(A) [Acts of God, etc.] and including any pending or declared government moratorium that the house purchased hereunder cannot be completed and made available for occupancy prior to the time provided for settlement hereunder or within a reasonable time thereafter, or if SELLER shall be unable to deliver good and marketable title to the property this agreement may be cancelled at the option of the SELLER upon ten (10) days' written notice to the BUYER. In the event of cancellation as provided for in this paragraph 9, SELLER'S liability shall be limited to the return of all moneys paid hereunder by the BUYER and upon such return, this agreement shall be null and void and SELLER shall be released from all obligations hereunder.

In Virginia, parties to a contract may provide the remedy that will be available to them in the event of breach so long as that remedy is not contrary to law or public policy. Such remedy may be exclusive only if the language clearly shows an intent that the remedy be exclusive, and it is the duty of the court to determine the intent of the parties from the language they employ. *Bender-Miller Co. v. Thom-*

---

**5.** Section 348(c) provides: "Sections 342 and 365(d) of this title apply in a case that has been converted under section 706, 1112, or 1307 of this title, as if the conversion order were the order for relief. 11 U.S.C. § 348(c).

**6.** If the debtor-in-possession or trustee had rejected the contracts during the Chapter 11, with-

out having previously assumed them, the same effective date of breach would apply pursuant to section 348(d). 11 U.S.C. § 348(d). Executory contracts which have been assumed and subsequently are rejected give rise to administrative claims. 11 U.S.C. § 365(g)(2).

*wood Farms, Inc.*, 211 Va. 585, 588, 179 S.E.2d 636 (1971).

The Court notes that the contract document is a printed form contract of the debtor and that the purchasers, accordingly, had little bargaining power concerning terms other than price and completion date. It is doubtful that either party intended to include the financial collapse of the builder among the events justifying cancellation, so that any attempt to discern the parties' intent regarding damages in the present circumstances would involve the Court in reckless speculation. Moreover, paragraph 9, by its terms, requires the debtor to have given the purchasers ten days' written notice of cancellation, which notice apparently never was given.

Accordingly, the Court concludes that any exclusivity of remedy provided for in Paragraph 9 of the contract would be insufficient, standing alone, to deprive the purchasers of a claim for damages.

 In Virginia, the measure of damages for breach by the seller of a contract to convey real property is limited to the return of purchase money actually paid, with interest, absent special circumstances justifying exception to the rule. *Horner v. Holt*, 187 Va. 715, 727–29, 47 S.E.2d 365 (1948). In order to recover anything beyond return of the money paid, the purchaser "must prove that the vendor either acted in bad faith ... has voluntarily disabled himself from making the conveyance [by conveying to another], or that he ... willfully neglected or refused" to convey. *Davis v. Beury*, 134 Va. 322, 114 S.E. 773

(1922). The rule imposes upon the purchaser the burden of proof of bad faith or other conduct by the seller sufficient to bring the case within the exception to the rule. *Id.*

In *Horner v. Holt, supra,* the court found that the builder-seller had willfuly refused to construct and convey to the purchaser pursuant to the contract because the price of materials had risen sharply. Because the seller's breach was willful, the court held that the purchaser was entitled to damages for the loss of his bargain. *Horner v. Holt, supra.*

 ACI has failed to demonstrate any bad faith, willful neglect, refusal, self-imposed inability such as conveyance to another, fraud, or collusion on the part of the debtor. Thus, the Virginia rule limits damages here to recovery of any purchase money actually paid plus interest from the date of payment. *Boston v. DeJarnette,* 153 Va. 591, 151 S.E. 146 (1930).

Accordingly, we find it unnecessary to reach the trustee's final objection which concerns the issue of whether ACI's appraisals of "comparable" properties as of July 1 and September 21, 1981 are too speculative a measure of damages in light of the March 18, 1981 effective date of debtor's breach of the three contracts.[7] Nor it is necessary to reach the question whether it is the "market value" or the "reproduction cost" in said appraisals which ought to be taken as the proper measure of damages.

Accordingly, "Claim B" of Claims 84, 85 and 86, for damages for breach of contract, will be disallowed.

An appropriate Order will enter.

---

7. For purposes of determining the status of these claims, the breach date of these contracts relates back and becomes effective March 18, 1981, pursuant to the provisions of Section 365(g)(1). The claims thus become pre-petition claims rather than administrative ones. In proper circumstances, however, another date may be used for purposes of computing the amount of damages. In a case in which fluctuating foreign currency exchange rates materially affected the amount that would be due, the First Circuit considered and rejected the "judgment date" rule applicable in certain non-bankruptcy currency exchange cases. However, the court then declined to follow the relation back provisions of section 365(g)(1) because the purpose of relation back would not have been served in the particular circumstances. The court held the breach date to be the date the contract actually was rejected by the debtor and fixed the damages as of the actual rejection date. *In re Good Hope Chemical Corp.,* 747 F.2d 806 (1st Cir.1984). Using the date of rejection in the case *sub judice,* however, would interject more time between the dates of the appraisals, summer 1981, and the date of actual rejection, March 20, 1983, and thus would diminish, rather than enhance, the probative value of claimant's evidence.