**In re Charles R. LONGO and Linda A. Longo, Debtors.**

**In re NATIONAL TRAINING SYSTEMS, INC., Debtor.**

**Bankruptcy Nos. 90–5–4–907A–SD, 90–5–4018–SD.**

United States Bankruptcy Court, D. Maryland.

Aug. 28, 1992.

Alan M. Grochal, Tydings & Rosenberg, Baltimore, Md., for debtor Charles Longo.

Howard A. Rubenstein, Adelberg, Rudow, Dorf, Hendler & Sameth, Baltimore, Md., for debtor Linda Longo.

Melvin C. Paul, Baltimore, Md., for Creditors Committee.

William F. Howard, Asst. Atty. Gen., Office of Atty. Gen., Educational Affairs Div., Baltimore, Md., for Md. Higher Educ. Commission.

## MEMORANDUM OF DECISION OVERRULING STANDING AND PRIORITY OBJECTIONS TO CLAIMS OF THE MARYLAND HIGHER EDUCATION COMMISSION

E. STEPHEN DERBY, Bankruptcy Judge.

### I. Background and Facts.

The Maryland Higher Education Commission (the "Commission") has filed claims in the cases of National Training Systems, Inc. ("NTS") and of Charles and Linda Longo (the "Longos"). NTS operated a vocational school, and Charles Longo was its president and sole shareholder. Groups from which NTS recruited students included persons receiving social service benefits, persons who were unemployed, those living in public housing, and the homeless. NTS would cause students to process guaranteed student loans to cover tuition and Pell grants to help with transportation and meals.

There came a time when NTS closed and thereafter failed to provide the educational services for which students had paid tuition. The Commission estimates its claim to be in excess of $8,000,000. It consists of

claims for tuition refunds for students, for payments due from NTS to the Guaranty Student Tuition Fund established by the Commission (the "Tuition Fund"), and for amounts required to be expended for NTS's record keeping and transfer obligations. Its claim in the case of Charles and Linda Longo is based on the Commission's assertion that, to prevent fraud and to enforce a paramount equity, the NTS corporate entity should be disregarded and Charles Longo held personally liable.

Debtors have objected to the Commission's claims on the grounds, *inter alia,* that: (1) the Commission lacks standing to bring claims on behalf of NTS students; (2) even if the Commission has standing, the claims for tuition refunds are not entitled to priority as consumer deposits under 11 U.S.C. § 507(a)(6); and (3) the annual payments owed by NTS to the Tuition Fund are not entitled to an excise tax priority under 11 U.S.C. § 507(a)(7)(E). Other objections, including the Longos' objection that their personal assets are protected by the corporate shield from liability for claims against NTS, are the subject of separate proceedings.

## II. Standing.

The issue of standing has three components: (A) does the Commission have standing under the doctrine of *parens patriae* and Maryland statutory law to file a proof of claim for refunds owed to former students of NTS; (B) is the Commission preempted from filing a proof of claim by the United States Secretary of the Department of Education; and (C) if standing exists, is the Commission's representation limited to those students who are Maryland residents.

### A.

■ The initial inquiry is under what authority the Commission asserts its proof of claim. In *NTS* and *Longo* the Commission's proofs of claim read: "This claim is filed in part on the Commission's own behalf, including the Guarantee Student Tuition Fund, and in part on behalf of former students of NTS as an aggregate claim."

There is no limitation of the Commission's proofs of claim to students who have received federal financial aid. Consequently, the right of standing asserted by the Commission is predicated, *inter alia,* on a theory of *parens patriae,* and not on guarantor liability.

The doctrine of *parens patriae* has been addressed by the Fourth Circuit in *In re Edmond,* 934 F.2d 1304 (4th Cir.1991), a case involving bankruptcy and Maryland law. In *Edmond,* the court examined the issue of whether the Maryland Consumer Protection Division ("Division") could assert *parens patriae* standing in a nondischargeability action. In *Edmond,* products ordered and paid for by consumers were not received. Refunds that had been promised by the debtor were never made. The standing alleged by the Division to bring an action for damages was predicated on Maryland's Consumer Protection Act. Md. Com.Law Code Ann. §§ 13-101—13-501 (1989).

The Division argued that it possessed the right to pursue monetary relief against the debtor. The debtor objected, *inter alia,* that the Division had not contacted consumers who had originally lodged complaints; and, also, that there was no plan for insuring that refunds contemplated by the Division's claim would in fact reach injured consumers. Consequently, the debtor argued that because the Division was unable to return whatever damages it collected to the aggrieved citizens, and because it possessed no authority to keep the money in the State treasury, the Division did not have standing to assert a claim.

The response of the Division was that the Consumer Protection Act conferred powers upon the Division which are not representative in nature. The Division could seek a monetary recovery under the Consumer Protection Act either for restitution or to require disgorgement to discourage future misconduct for the well-being of the consuming public. The monies, it argued, could be retained by the State if the injured consumers could not be located. Therefore, the Division asserted that the right to proceed as *parens patriae* is not

restricted to those cases necessarily leading to the individual pecuniary benefit of some consumers.

To apply the doctrine of *parens patriae,* the *Edmond* court relied on the leading case of *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Therein Justice Brennan explained that *parens patriae* standing may be accorded if "the state [is more than] a nominal party without a real interest of its own." *Id.* at 600, 102 S.Ct. at 3265. The action "must articulate an interest apart from the interests of a particular private parties...." *Id.* at 607, 102 S.Ct. at 3268. *Snapp & Son* recognized that *parens patriae* standing often arises in areas where the state would be likely to have addressed injuries through its sovereign law-making powers. *Id.* In *Edmond* the court recognized specifically that the Consumer Protection Act conferred upon the Division an interest in enforcement apart from the interests of any individual injured consumer, and it empowered the Division to act on its own initiative. *Edmond,* 934 F.2d at 1310.

Maryland courts had interpreted § 13–302 of the Maryland Consumer Protection Act as enabling the Division to initiate administrative hearings. *Consumer Protection Division Office of the Attorney General v. Consumer Publication Company,* 304 Md. 731, 501 A.2d 48 (1985). Additionally, Maryland law provided that at the conclusion of an administrative hearing an order could issue "requiring the violator to cease and desist from the violation *and* to take affirmative action, including the restitution of money or property." Md.Comm. Law Code Ann. § 13–403(b)(1) (Emphasis supplied). The foregoing persuaded the *Edmond* court that the Consumer Protection Act embodies a broad state interest to protect all consumers, present and future. Further, when proceeding under the Act, the Division represents a quasi-sovereign interest. It was the presence of this quasi-sovereign interest that the court in *Ed-*

*mond* found conferred *parens patriae* standing. *Edmond,* 934 F.2d at 1311.

The parallels between the Division's powers under Maryland's Consumer Protection Act and the Commission's authority under Maryland's Education Code are persuasive. Among its general powers and duties, the Commission may regulate post-secondary educational institutions. Md.Educ.Code Ann. § 11–105 (1991). The Commission may "adopt any rule or regulation necessary to carry out its powers and duties." *Id.* at § 11–105(q). One such regulation applicable to nonpublic career schools requires every school to have a minimum refund policy if a student withdraws that is printed on the student's enrollment contract. COMAR 13B.01.01.05(I)(4), (5), (6) and (7) (1990).[1] By statute the Commission is expressly authorized to "require any private career school offering unapproved programs to refund all tuition and fees paid by students who enrolled in such programs...." Md.Educ.Code Ann. § 11–107(b). Further, full tuition refunds are required by the Commission whenever a private career school closes or otherwise discontinues a program. *Id.* at § 11–205(b)(2); COMAR 13B.01.01.05(I)(2) (1990).

The Commission has the power to enforce these requirements on its own initiative. It may cite schools for deficiencies concerning the Commission's "conditions and standards". Md.Educ.Code Ann. § 11–204. More importantly, it is authorized "to seek an injunction *or other judicial remedy* for any violation of this title or of the rules and regulations adopted under this title". *Id.* at § 11–107(a). (Emphasis supplied). The Commission's right to demand refunds is thus sufficiently articulated under Maryland's Education Code and corresponding regulations to authorize it to file a claim.

The Commission possesses standing under the doctrine of *parens patriae* to assert tuition refund claims that students might otherwise assert directly in this proceeding. The rights and remedies of the Consumer Protection Division of the State

---

1. The regulations as revised in 1991 contain substantially similar minimum refund require-
ments. COMAR 13B.01.01.12(L), (H) and (I) (1991).

of Maryland and the Maryland Higher Education Commission are substantially similar under their respective enabling statutes. The Commission has a public interest that is greater than representation of individual students, namely, to assure that unearned tuitions are not retained and that statutory violators disgorge tuition benefits.

The *Edmond* court concluded that "the Act gave the Division *parens patriae* standing to proceed against Edmond in bankruptcy court. The Division acted, not as a class representative, but on behalf of the state's quasi-sovereign interest in insuring consumer protection and in securing its borders against violations." *In re Edmond,* 934 F.2d at 1313. The Consumer Protection Act § 13–403(b)(1) empowered the Division to pursue an order "requiring the violator to cease and desist from the violation and to take affirmative action including the restitution of money or property."

Analogously, the Commission's remedial powers under § 11–107(a) of the Education Code include the power to seek an injunction or other judicial remedies. The Commission is a regulatory body authorized to assert the monetary claims and enforcement requirements on behalf of the State of Maryland against post-secondary institutions. Therefore, it has standing to pursue proofs of claim in these proceedings.

### B.

Debtors further object that the proper party in interest to file a claim on behalf of the students, other than the students themselves, is the United States Secretary of Education, and not the Commission. They argue that the Higher Education Act of 1965, 20 U.S.C. § 1070(b), has delegated to the Secretary of Education the responsibility for governing student funds from federal grant and loan programs. Implementing regulations provide:

(a) When an institution ... ceases to provide educational instruction, it shall—

\* \* \* \* \* \*

(6) Distribute refunds of unearned tuition and fees according to § 668.21.

34 C.F.R. 668.25(a)(6). Section 668.21(a)(2) then provides:

(2) The institution shall return that overpayment to the respective Title IV, HEA programs in the amount that the student received from each program.

Consequently, Debtors argue that the Commission has been preempted, and NTS is required to return money due, if any, to the various federal programs from which the funds originated, presumably based on a claim by the Secretary that has not been filed in this case.

Debtors' objection is not well taken. First, the regulations relied upon by Debtors are not applicable to the Commission's claims. The quoted regulations are applicable to refunds where the funds originated directly from the federal government, *e.g.,* in this case Pell Grants. 34 C.F.R. 668.21. The Commission's claim does not include refund of Pell Grants. Other regulations are applicable to refunds of tuitions paid for by guaranteed student loans, and those regulations provide for the refund payments to be paid over to the lender or guarantor that advanced the funds. See 34 C.F.R. §§ 668.25(a)(2), 682.209(e)(2)(i), 682.-604(d)(3), 682.604(d)(4), 682.604(e), 682.-606(a)(2), 682.607(a) and (b) and 668.23(e)(4).

Second, there is no express, federal preemption provision relating to refunds of tuitions paid for by guaranteed student loans that vests collection power solely with the U.S. Secretary of Education. Indeed, federal preemption of the collection function would not make logical sense because the federal government was neither the borrower nor the lender responsible for administering the loan. Rather, the United States was a secondary, contingent creditor as a guarantor of last resort. The tuition refund regulations even defer to the requirements of State law if they provide for larger refund amounts. 34 C.F.R. § 682.-606(b)(1). Additional support for this conclusion is that the United States appeared at the hearing on these objections and supported the Commission's position.

Third, the State has not filed this claim as guarantor of student loans. Rather, it has filed this claim in substantial part *in*

*parens patriae* for the students. As discussed previously, the Commission's *parens patriae* standing is predicated on the State having a real interest of its own in pursuing the claims. See *Alfred L. Snapp & Son, Inc., supra,* 458 U.S. at 600, 102 S.Ct. at 3265.

Fourth, the Commission's claim in part is a direct claim for amounts due to the Tuition Fund. The Tuition Fund is independent of any federal interest.

Fifth, some of the Commission's tuition refund claims do not involve tuition paid by guaranteed student loans. The Commission claims by example that at least one student contemplated within its proof of claim, Kimberly Ross, paid $4,459.00 to NTS by personal check. Further, the Commission represents that NTS students were frequently required to make a small deposit from their own personal funds when signing up for courses. Therefore, even if there was an exclusive right of the federal government to file a proof of claim based on federal financial aid, it could not encompass all of the students claims represented by the Commission.

Therefore, while it appears there is nothing to preclude the United States Secretary of Education from having filed a timely proof of claim as a guarantor of student loans, there is also nothing to preclude the Commission from filing a proof of claim in its own right under applicable State law.

### C.

■ Finally, Debtors argue that even if the Commission has standing to file a proof of claim for refunds owed to students, the claim must be limited to claims for Maryland students.

The court finds that the Commission may extend its tuition refund claim to out-of-state students. The Education Code § 13–107 does not specify that refunds may only be ordered where Maryland citizens have been injured. Whether recipients are citizens of the State of Maryland is not the issue. The issue is whether NTS in this case may be compelled, as it would be under State law, to turn over refunds of tuition to all students, regardless whether they are Maryland citizens.

The State's interests are not limited to Maryland citizens. Maryland has an interest in preventing violations of the law within its borders and in preventing wrongdoers within its borders from retaining gains from their wrongdoing. Illustrative on this point is *In re DeFelice,* 77 B.R. 376 (Bankr.D.Conn.1987), relied upon by the *Edmond* court. In *DeFelice,* the court held that "[t]he fact that individual consumers would also benefit from the Attorney General's action does not subvert that quasi-sovereign interest. New York's quasi-sovereign interest is served whenever perpetrators of consumer fraud within its borders are brought to justice *regardless of whether their victims happen to be citizens.*" *DeFelice,* 77 B.R. at 380 (Emphasis supplied). Accordingly, the Commission's proof of claim is not restricted to Maryland students only.

### III. Consumer Deposit Priority.

■ The Commission has claimed a consumer deposit priority under 11 U.S.C. § 507(a)(6) on behalf of the NTS students. Debtors assert that the student refund claims are not entitled to priority under the Bankruptcy Code because the services to be rendered by NTS did not fall within the scope of § 507(a)(6). The refund claims at issue arise from educational service contracts between NTS and the students. Section 507(a)(6) of the Code grants a sixth priority status to:

> allowed unsecured claims of individuals, to the extent of $900.00 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

■ The issue raised is whether the services to be provided by NTS were for the personal use of the students. NTS asserts that as a vocational school, the lessons it was to provide the students were to be used in business. Therefore, it argues that

claims for NTS' tuition deposits are not entitled to priority status because NTS' training services should be classified as services that were business in nature, and not personal. NTS correctly asserts the proposition that purchases made for business purposes fall outside of the consumer deposit priority. *In re Carolina Sales Corp.*, 43 B.R. 596 (Bankr.E.D.N.C.1984). However, NTS incorrectly classifies the services it was to provide the students as a business purchase.

In *Carolina Sales* the debtor, a wholesale distributor of major appliances, conducted various campaigns to promote sales to retailers. One of those promotional campaigns was a tour to Canada. The cost of the tour was $800.00, but dealers could earn points which would be credited against the cost of the tour by purchasing appliances from the debtor. Although the court found that a consumer priority did not exist to the extent of any bonus points earned toward the price of the Canadian trip, it did grant the priority to those individual retailers who made cash deposits. *Id.* at 597. The court stated: "While the Canadian tour was used by the debtor to further the mutual business relationship between the debtor and retail dealers, the trip itself was not a business trip, it was a pleasure trip for individuals." *Id.* Finding that the cash deposits made for the trip were for the personal enjoyment of the retailers, the court further classified the retail dealers as consumers by stating: "The claimants, even though their retail businesses purchased products from the debtor, did not extend credit to the debtor and had no way of ascertaining the debtor's credit worthiness." *Id.* at 598.

The priority claims asserted in the instant cases arise from educational service contracts which were not performed by NTS. The students of NTS were not buying shares of the corporation; they were not purchasing any business advantage between themselves and NTS; and they were not extending credit to NTS. What the students purchased was a service contract for lessons. Such a purchase is encompassed by § 507(a)(6) of the Bankruptcy Code. That section specifically includes a deposit for "the purchase of services" in the grant of priority. Moreover, the legislative history demonstrates that Congress intended to include contracts for lessons within the priority for consumer services.

A consumer that pays money on a layaway plan or as a deposit on merchandise, or that buys a service contract or *a contract for lessons* or a gym membership, is a general unsecured creditor of the business to which he has given his money. Very few consumers are aware of their status as general unsecured creditors. If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag. Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors. Because of his ignorance and his inability to bargain with the retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do....

In order to remedy this problem and to reorganize the position of *consumer creditors as different from that of business creditors,* the bill provides *a priority for consumer creditors of a bankrupt business.*

H.R.Rep. No. 595, 95th Cong., 1st Sess. 188 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6148. (Emphasis supplied.) Further, as the quoted legislative history demonstrates, Congress drew a distinction between business creditors and consumer creditors of a business; and it provided priority status to the latter.

Discussing the relationship between a vocational school and its students, the court in *In re Draughon Training Institute, Inc.,* 119 B.R. 921 (Bankr.W.D.La.1990), classified the relationship as consumer in nature. In *Draughon Training,* the question was whether the Texas Education Association's post-petition denial of a certificate of approval to a Chapter 11 debtor vocational school was discriminatory under 11 U.S.C. § 525 or in violation of the § 362 stay, where there was a legitimate reason

for the denial independent of the debtor's bankruptcy. The reason for the denial of the certificate of approval was because the debtor failed to maintain a policy, required by statute, to ensure refund of unused student tuition and fees. The court described the purpose of this policy for refunds to vocational school students as follows:

> It provides protection to the members of the public *who are consumers of the services sold by Draughon* by ensuring prompt repayment to all students who for whatever reason do not complete the courses at Draughon they have paid for in advance.
>
> Consumer protection is a valid exercise of police and regulatory power for purposes of the Section 362(b)(4) exemption from the automatic stay.

*Id.* at 924 (dictum) (Emphasis supplied.). However, the court held that the certificate of approval was property of the estate; and Texas, by terminating the certificate, had violated 11 U.S.C. § 362(a)(3). Nevertheless, the court's discussion in *Draughon Training* accurately portrays the consumer relationship that exists between a vocational school and its students.

▪ NTS also asserts that it falls outside of the scope of § 507(a)(6) because NTS is not a merchant. Cases have recognized the distinction between consumer payments made to a merchant and a nonmerchant, and have allowed consumer priorities for both. *E.g., In re James R. Corbitt Co.,* 48 B.R. 937 (Bankr.E.D.Va.1985); *In re Carolina Sales, supra.* As stated in *In re James Corbitt,* the legislative history mentions "service contracts, contracts for lessons, and contracts for gym memberships *along with transactions with 'retail merchants'* as representative examples of situations in which the priority would apply." *In re James R. Corbitt Co.,* 48 B.R. at 939. (Emphasis supplied.) Further, the language of the statutory priority is not limited to merchants. Therefore, there is no legal basis for the assertion by NTS that its students should not be granted the priority because NTS is not a retail merchant.

The purpose of § 507(a)(6) is to protect the innocent consumer who is unable to protect himself or herself. As stated in an opinion by Chief Judge Mannes of this Court: "Clearly the intention of Congress was to protect the individual creditor who was unable to protect himself and was the last to receive the news of the impending insolvency." *In re P.J. Nee Co.,* 36 B.R. 609, 611 (Bankr.D.Md.1983). Judge Mannes' statement accurately reflects the section's legislative history, and it is applicable here with respect to students of NTS. The students purchased a service contract for lessons from NTS, and those lessons were not provided. Prospective vocational school students, such as students of NTS, may be inexperienced and unable or unlikely to obtain a credit history of the school or to bargain for special terms. In the case of *In re James R. Corbitt Company, supra,* 48 B.R. at 939–940, the court, in allowing a consumer deposit priority, discussed the inexperience of prospective home buyers and the unlikelihood of their obtaining a credit history of developers. Because of their lack of experience, and their ignorance of the debtor's credit history, the students of NTS would be left "holding the bag" without a consumer deposit priority. This result is exactly what Congress intended to avoid. H.R.Rep. No. 595, 9th Congress, 1st Sess., *supra,* at 188, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6148.

For these reasons, students of NTS are entitled to the priority afforded under § 507(a)(6). These students purchased a service contract for lessons which is literally covered by the section and supported by the section's legislative history. Although NTS classifies itself as a vocational school, it had a consumer relationship with its students, and those students are among the class of creditors § 507(a)(6) was designed to protect. Whether the priority status of the tuition refund claims against NTS can be carried over and asserted against Charles Longo is not decided here and appears to depend on whether the NTS corporate entity can be disregarded.

### IV. Excise Tax Priority.

▪ The commission claims that the annual payments required to be paid by NTS

into the State's Guaranty Student Tuition Fund are entitled to priority as an excise tax under 11 U.S.C. § 507(a)(7)(E). Md. Educ.Code Ann. § 11–203(d) (1989); COMAR 13B.01.01.09 (1990). The Tuition Fund is a claim fund maintained by the Commission. It provides partial and secondary protection for students of private career schools who lose their tuition when a private career school closes. *Id.* NTS has accepted the Commission's estimate that $12,100.00 is the amount owed to the Tuition Fund by NTS. The Commission asserts a tax priority under § 507(a)(7)(E) for this $12,100.00. NTS objects because it contends that payments to the Tuition Fund are merely fees charged for the privilege of operating a trade school in Maryland, rather than a tax.

Payments to the Fund are not merely fees charged for the privilege of operating a trade school in Maryland. The purpose of the Fund is to provide students of private career schools with some protection against the loss of their tuition and fees. Md.Educ.Code Ann. § 11–203(d)(2). The statute sets out in part:

(d) Guaranty fund for private career schools.—(1) By rule and regulation, the Commission may create and provide for the operation of a guaranty fund for private career schools.

(2) The fund shall be used to reimburse any student at a private career school who suffers a loss of tuition and fees because the institution has violated any provision of subsection (a)(1) or (2) of this section.

(3)(i) Each private career school that is required to obtain a certificate of approval shall pay an annual fee into the fund.

*Id.* at § 11–203(d).

When classifying a payment, regardless of how it is labeled, for the purpose of a bankruptcy tax priority, "the chief distinction is that a tax is an exaction for public purposes while a fee relates to an individual privilege or benefit to the payer." *United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1106 (6th Cir.1984). In *New Neighborhoods, Inc. v. West Virginia Workers'* *Compensation Fund,* 886 F.2d 714 (4th Cir.1989), the Fourth Circuit concluded that the designation of an employer's payments into a special claim fund as "premiums" in West Virginia's Workers' Compensation statute was not determinative of whether such payments constituted an excise tax entitled to priority. "[T]he 'label' does not control." *Id.* at 718. The court further stated: "[A] payment may be classified as a tax [under 11 U.S.C. § 507(a)(7)(E) ] if the state has compelled the payment and if the payment serves a public purpose." *Id.* In *New Neighborhoods,* the court held that state workers compensation premiums payable into the special claim fund were excise taxes for priority purposes because they served the public purpose of providing for injured employees and their dependents. *Id.* at 717–719.

In order to obtain a certificate of approval, a career school must pay a non-refundable application fee of $300.00. COMAR 13B.01.01.04(2)(d). This application fee bestows the private benefit of operating a career school in Maryland, and that benefit is not shared by the rest of society. The application fee could not be considered a tax because it bestows a private benefit upon the school, and serves no public purpose. *See In re Jenny Lynn Mining Co.,* 780 F.2d 585 (6th Cir.1986). However, the annual payments required to be paid by private career schools into the Tuition Fund are distinguishable from the application fee because the Tuition Fund does support a public purpose. That public purpose is the economic protection of private career school students in Maryland.

The payments due the Fund by NTS are taxes for purposes of § 507(a)(7)(E) priority, because the payments are compelled by the state and are for a public purpose. That public purpose is protection for students of private career schools who lose their tuition and are unable to obtain a refund when a private career school closes. Whether the tax priority can be asserted against Charles Longo again must await determination of other issues.

314

### V. Conclusion.

For the reasons stated, Maryland has standing to assert its claims in their entirety, and its claims for tuition refunds have not been preempted by the U.S. Secretary of Education. Further, its claims against NTS *in parens patriae* for tuition refunds are entitled to consumer deposit priority under 11 U.S.C. § 507(a)(6), and its claim for the State's Guaranty Student Tuition Fund is entitled to excise tax priority under 11 U.S.C. § 507(a)(7)(E), at least against NTS. A separate order which overrules the subject objections will be entered to implement this decision.