# Richmond

## Two-Way Tronics, Inc. v. The Greater Washington Educational Television Association, Inc.

April 26, 1965.

Record No. 5897.

Present, All the Justices.

*Temple W. Seay* and *A. Andrew Giangreco*, for the appellant.

*Griffin T. Garnett, Jr.* (*Edmund D. Campbell,* on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

On August 6, 1962, The Greater Washington Educational Television Association, Inc., hereinafter called GWETA, instituted a suit for a declaratory judgment and further relief against Two-Way Tronics, Inc., hereinafter called Two-Way. The bill of complaint alleged that an actual controversy existed between GWETA and Two-Way with respect to the construction of a written lease or "License Agreement" which, among other things, gave GWETA, the lessee, an option to purchase from Two-Way, the lessor, certain land with a transmitter building and a steel tower located thereon in the city of Arlington. The cause was heard *ore tenus* and by final decree entered on October 24, 1963, the chancellor awarded GWETA specific performance as prayed for. We granted Two-Way an appeal.

Two-Way is engaged in the business of leasing or "licensing" space on the tower involved in the suit for the installation of radio and television antennas and space in the adjacent transmitter building for the installation of transmitting equipment to persons or corporations who wish to broadcast radio or television signals. GWETA is a non-profit corporation engaged in producing and broadcasting educational television programs which are received in schools of northern Virginia and the District of Columbia.

On August 19, 1960, Two-Way and GWETA executed a written contract of lease entitled "License Agreement" which provided, *inter alia,* that GWETA could install and maintain its television antenna upon the top of Two-Way's tower and its transmitter in Two-Way's building for an initial period of five years commencing August 1, 1960, with the right of renewal for two additional three-year terms. GWETA was to pay an annual rental of $5,000 for the first year, $10,000 for each of the next four years, $11,400 for each of the following three years, and $12,000 for each of the final three years.

At the time this agreement was entered into, Two-Way had leased space on the tower and in the transmitter building to about six tenants in addition to GWETA and was receiving from them a total monthly rental of approximately $375.

Under Section 14[1] of the agreement of August 19, Two-Way granted to GWETA an option to purchase within two years from date of execution "the premises within the confines of existing cyclone fence and owned by LICENSOR at 5217 North 19th Road, Arlington, Virginia, more particularly described as PARCEL 1 in

---

[1] "14. (a) It is agreed and understood that within two years after the execution hereof LICENSEE [GWETA] shall have the option to purchase the premises within the confines of existing cyclone fence and owned by LICENSOR [Two-Way] at 5217 North 19th Road, Arlington, Virginia, more particularly described as PARCEL 1 in LICENSOR'S deed, together with all improvements thereon, including the transmitter building and tower for One Hundred Thousand ($100,000.00) Dollars. Upon exercise of this option, which shall be in writing directed to LICENSOR, LICENSEE shall be obligated to enter into a contract of purchase and take title within sixty (60) days. There shall be deducted from the purchase price rental payments made by LICENSEE to LICENSOR under this agreement up to the time of closing contemplated herein. Taxes and other similar items shall be adjusted to date of closing. *Title to the property specified shall be good of record and free of encumbrances except with respect to certain license agreements referred to hereafter.*

"(b) It is recognized that following the closing following the purchase provided for herein that *certain license agreements heretofore entered into by LICENSOR with other licensees* respecting the use of the tower and building *may or will be outstanding.* Therefore, it is understood and agreed that following the exercise of such option and prior to the closing of such sale LICENSOR and LICENSEE shall enter into a mutually satisfactory lease agreement whereunder LICENSOR herein shall be authorized to carry out to their fulfillment *those agreements* for the entire term of any renewal as provided for *in such agreements* with the same force, effect and enjoyment and with the same rights and privileges now enjoyed by LICENSOR as the owner of such premises.

"(c) It is understood and agreed that LICENSOR will pay to LICENSEE as full compensation for the right to carry out its business activities, as the lessee of LICENSEE herein a total of five (5%) percent of the gross annual rentals then or thereafter received by LICENSOR from *such outstanding agreements.* Such percentage shall be payable annually, the first payment to be due on the anniversary of the closing date of the sale contemplated herein.

"(d) It is understood and agreed that in consideration of the granting of the option to purchase the property and assets that LICENSEE may have the privilege of purchasing the *said existing license agreements* either at or after the exercise of the option to purchase and pay for and have assigned to it *all of the license agreements* between the LICENSOR and LICENSEES *presently and at that time making use of the premises* for specified rentals, upon such terms and conditions as may be negotiated at the time and mutually acceptable to both parties, *provided,* however, that at the expiration of the eleven (11) year period provided for in Paragraph (5) LICENSEE having exercised its option to purchase the said property and assets shall as a condition to the consummation of such purchase be required to purchase *the said agreements* upon such terms and conditions as may be negotiated at the time and mutually acceptable to both parties. At that time, that is, when the purchase price of *the said license agreements* shall have been agreed upon and the payment received, the privilege of the further use of the premises by the present LICENSOR shall cease and terminate." (Italics supplied.)

LICENSOR'S deed, together with all improvements thereon, including the transmitter building and tower" for $100,000, subject to a credit for all rents paid by GWETA prior to the purchase date. Sometime before the option period expired, GWETA negotiated with Two-Way in an unsuccessful attempt to secure an extension of it. During the course of negotiations a dispute arose between the parties over the interpretation of certain provisions contained in Section 14, the "Option to Purchase", and an exchange of correspondence followed.

GWETA took the position that upon its exercise of the option it was entitled to acquire title to the tower and building free of all encumbrances except the license agreements which Two-Way had made with third parties prior to August 19, 1960, and that it was entitled to receive after settlement all rentals to become due from the license agreements which Two-Way had entered into after August 19, 1960. It did not dispute the fact that after the sale Two-Way could continue to receive 95% of the rental income from the license agreements made prior to August 19, 1960.

On the other hand, Two-Way in substance contended that it had the right to convey title subject to the license agreements entered into both before and after August 19, 1960; that after the sale it could continue to collect all rentals from the license agreements made with third parties subsequent to August 19, 1960; and that its rights in all of the license agreements would not cease until purchased by GWETA on or before August 1, 1971.

By June 15, 1962, Two-Way had leased space on the tower and in the transmitter building to approximately 26 "licensees" and its rental income had increased substantially since leasing space to GWETA.

Correspondence and conversations between the parties failed to bring about an agreement on the construction of the "Option to Purchase" and it became apparent that an impasse had been reached. Alfred C. Cordon, Jr., president of Two-Way, in a letter dated June 14, 1962, addressed to Edmund D. Campbell, counsel for GWETA, rejected GWETA's interpretation of the option to purchase as was outlined in Campbell's letter to Cordon dated May 2, 1962. Upon receipt of this letter, Campbell, on June 15, replied to Cordon. The letter stated in part:

"The contentions which you make are violative of GWETA's rights under its license agreement with your company dated August 19, 1960, and are unacceptable to GWETA.

"GWETA is today formally exercising its option to purchase. Notice to this effect has been mailed your company * * * GWETA is formally tendering to you herewith a proposed 'Contract to Purchase'. This proposed contract to purchase, which has been signed by GWETA, follows closely the language of the license agreement itself, but GWETA is prepared to consent to any reasonable change in such language which does not impair GWETA's rights under the license agreement * * *.

"Formal request is hereby made upon you that you execute the enclosed contract to purchase and return an executed copy to us promptly. * * *

"Failure on your part to execute and return to us the enclosed contract, either in its present form or with such minor changes in language as you may wish to make, will be construed by GWETA as a formal repudiation of your obligation under the agreement of August 19, 1960, and will leave GWETA no recourse except to seek to enforce its rights to purchase the property by litigation.

"GWETA does expect to purchase the property and tenders itself ready and willing to do so in accordance with the terms of the agreement of August 19, 1960."

Two-Way did not execute the "Contract to Purchase" submitted by GWETA, but requested a conference to be held on August 6. At the stated time Campbell met with Cordon and his associate, Temple W. Seay, but their differences were not resolved. That afternoon Campbell filed a bill of complaint on GWETA's behalf thereby instituting this suit.

The court's final decree provided, among other things, that the contract of August 19, 1960 was valid and binding upon both parties; that it was divisible; that its language was not ambiguous; that GWETA had validly exercised its option to purchase the property from Two-Way and was entitled to specific performance; that GWETA was relieved of the obligation of making formal tender of the purchase price because of Two-Way's anticipatory breach; that Two-Way was entitled to receive from GWETA the net purchase price of $84,400, as of August 15, 1962, together with interest thereon from said date to the date of delivery of the deed; that all license agreements entered into between Two-Way and third parties up to and including August 19, 1960, would remain the property of Two-Way, but that GWETA was entitled to 5% of the gross rentals from and after August 15, 1962, and that GWETA was entitled to receive as a credit against the purchase price the profit from

all license agreements entered into between Two-Way and third parties after August 19, 1960 which accrued after August 15, 1962, and also all rentals GWETA paid to Two-Way from and after August 15, 1962.

The decree further provided that Two-Way was to convey the property to GWETA free and clear of encumbrances except the license agreements which had been entered into prior to August 19, 1960, and that the deed was "to contain express language setting forth the possibility of a reverter," i.e., if GWETA did not purchase from Two-Way by August, 1971 all of the still existing license agreements which had been entered into prior to August 19, 1960, upon terms mutually acceptable to both parties, the property would revert to Two-Way. It is from this final decree that Two-Way has appealed.

Two-Way has made nine assignments of error, but some of them are closely related and will be considered together. It first contends that the court erred in awarding GWETA specific performance of the contract because: (1) GWETA did not make a tender of the purchase price or show that it was financially capable to exercise the option to purchase, and (2) GWETA filed its bill of complaint in advance of the date for final performance without making a reasonable effort to compose a suitable "contract of purchase" required under Section 14(a) of the "License Agreement". We find this contention to be without merit.

The option was exercised on June 15, 1962, and Section 14(a) of the "License Agreement" provided that GWETA was "obligated to enter into a contract of purchase and take title within sixty (60) days." Hence, under the terms of the agreement GWETA had until August 15, 1962 to make tender and conclude the purchase. It is true that GWETA instituted this suit prior to that date, but the record discloses that on the day the option was exercised it executed and delivered to Two-Way a contract of purchase which substantially followed the language contained in Section 14 of the "License Agreement." Two-Way rejected this contract and refused to sign it. In Cordon's letter to Campbell, dated June 14, Two-Way emphatically rejected GWETA's interpretation of the option agreement later adopted by the court. Thus, by its actions Two-Way committed an anticipatory breach of the agreement which relieved GWETA of any obligation to make a tender of the purchase price or to further negotiate a closing contract and permitted it to institute suit before the time for performance had arrived.

"* * * [A] refusal to perform or a repudiation of the contract will excuse the other party from making a tender. * * *" 18 M. J., Tender, § 13, p. 463, and cases there cited.

In *Mutual Reserve Fund Ass'n* v. *Taylor*, 99 Va. 208, 213, 37 S.E. 854 this court stated:

"[W]hen one party to a contract has entirely abandoned it, or has absolutely refused to perform it, the other party may elect to sue on it without waiting for the time of performance to arrive." See also 4 M. J., Contracts, § 76, p. 431, and cases there cited.

Moreover, Mrs. Elizabeth Campbell, president of GWETA, testified that subsequent to June 15, 1962, the corporation was "ready, willing and able" to purchase the property under the terms of the agreement. At the trial Campbell tendered cashier's checks in the sum of $82,000, an amount sufficient to cover the net purchase price. The record shows that during the trial G. T. Garnett, Jr., of counsel for GWETA, made this statement to the court: "With the understanding of the parties it [checks] may be retained by Mr. Campbell, and it will be understood that proffer or tender of payment was made." The funds are now on deposit in a special escrow account subject to the further order of the court.

The dominant question presented is whether, under the terms of Section 14, the option to purchase contained in the "License Agreement", the rentals accruing after settlement of the sale on leases entered into between Two-Way and third parties subsequent to August 19, 1960, were to be retained by Two-Way or were to pass to GWETA along with the property.

The key to the question lies in the meaning of the word "heretofore" as it appears in the first sentence of Section 14(b). The sentence reads: "It is recognized that following the closing following the purchase provided for herein that *certain license agreements heretofore entered into* by LICENSOR with other licensees respecting the use of the tower and building may or will be outstanding." (Emphasis added.)

Two-Way relies heavily upon the language of Section 14(d) and contends that the phrase "all of the license agreements between the LICENSOR and LICENSEES presently and at that time making use of the premises" should be construed to include the license agreements entered into subsequent to August 19, 1960, as well as those executed prior to that date.

GWETA, on the other hand, takes the position that the language contained in Section 14 is clear and unambiguous; that the word

"heretofore" refers only to the license agreements entered into prior to August 19, 1960, and that all references to license agreements in Section 14 (including 14(d)) relate to those agreements "heretofore entered into". We agree with GWETA's position.

In 39 C.J.S., p. 893, the word heretofore is defined.

"The word heretofore denotes time past, generally, as distinguished from time present or future, without conveying the idea of comprehending any remote time in this or the last century, and, in its common acceptation, means before; before and up to the present time; before, or down to, this time; hitherto; in time past, previous time, or previously; up to this time; and it may mean in times before the present; formerly. * * *

"It has been held equivalent to 'anterior' * * *." See also *Cyclopedic Law Dictionary*, 3rd edition, pp. 526, 527; *Black's Law Dictionary*, 4th edition, p. 859; *Webster's Third New International Dictionary*, p. 1059.

The last sentence of Section 14(a) provides that "Title to the property specified shall be good of record and free of encumbrances except with respect to certain license agreements referred to hereafter." The first sentence of Section 14(b) then proceeds to identify these license agreements as those which were "heretofore entered into", i.e., prior to August 19, 1960, the date the option agreement was executed. It is manifest from a reading of the first sentence in Section 14(b) that the parties intended only those licenses to be an encumbrance on the title at the time of purchase or settlement. It is also apparent that Sections 14(c) and 14(d) each refers directly back to Section 14(b). For example 14(c) contains the phrase "such outstanding agreements", and these words can refer only to those license agreements set forth in Section 14(b) which were "heretofore entered into". In a like manner, the phrase "the said existing agreements" in paragraph 14(d) contemplates the agreements made prior to August 19, 1960. It is true that Section 14(d) also uses the words "all of the license agreements" with licensees "presently and at that time making use of the premises", but these words also refer directly back to the licenses "heretofore entered into" contained in 14(b) and merely contemplate the possibility that use of the premises under certain of these licenses may have been discontinued when GWETA exercised its right to purchase the licenses.

We hold that by the terms of the option agreement Two-Way was required to convey to GWETA the subject property free of encumbrances except with respect to those license agreements entered

into by Two-Way and third parties prior to August 19, 1960, and that the rentals accruing after settlement of sale on leases or licensing agreements entered into by Two-Way and third parties subsequent to August 19, 1960, were to become the property of GWETA.

Two-Way also claims that the chancellor erred in holding that the "License Agreement" was divisible or severable and "in decreeing specific performance which would effect the transfer to Plaintiff [GWETA] of properties belonging to third parties, not before the Court." He further contends that the decree results in unjust enrichment to GWETA. We find that these contentions are without merit.

Our conclusion is that there is no reversible error in the decree appealed from and it is

*Affirmed.*