**In re LCS HOMES, INC., Debtor.**

**LCS HOMES, INC., Plaintiff,**

**v.**

**DRIGGS BUILDING SYSTEMS, INC. and John Driggs, Defendants,**

**Robert Fletcher, Intervenor.**

**Bankruptcy No. 87–02029–A.**
**Adv. No. 87–0055–A.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

July 25, 1989.

738

Joseph F. Manson, III, McGary, MacDowell & Manson, P.C., Fairfax, Va., for debtor.

Wiley R. Wright, Jr., H. Bradley Evans, Jr., Hazel, Thomas, Fiske, Beckhorn & Hanes, P.C., Alexandria, Va., for defendant, Driggs Bldg. Systems, Inc.

Robert B. Easterling, Easterling & Goodall, Stafford, Va., for intervenor, Robert Fletcher.

Roy B. Zimmerman, Alexandria, Va., for defendant, John Driggs.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

LCS Homes, Inc. (hereinafter "LCS"), a debtor in this Court, filed a complaint against Driggs Building Systems, Inc. (hereinafter "DBSI") seeking a declaratory judgment that DBSI breached its contract by failing to perform a condition precedent. DBSI answered and filed a counterclaim alleging that LCS Homes prevented DBSI from performing the condition precedent by committing an anticipatory breach of the contract and seeking monetary damages. Prior to the date set for trial, this Court granted leave to add John Driggs (hereinafter "Driggs"), individually, and Robert Fletcher (hereinafter "Fletcher"), a former employee of LCS Homes, as defendants. Fletcher in turn filed a counterclaim against LCS Homes alleging that LCS prevented a sale of property from closing and thus prevented Fletcher from receiving his real estate commission. LCS Homes amended its complaint, to add nine additional counts seeking declaratory judgment and one count seeking monetary damages for breach of an occupancy agreement. Generally, the amended complaint seeks a declaratory judgment that the defendants failed to perform the conditions precedent by refusing to obtain approval for its assumption of a promissory note and refusing to settle on the date provided for in the contract, that the defendants were not excused from their failure to settle, that time was of the essence, that the defendants were not excused from their fail-

ure to settle on the settlement date as provided in the modified contract, that their failure to settle within a reasonable time was a failure to fulfill a condition precedent, that the modifications to the contract are void under the Statute of Frauds, and that the defendants waived their legal and equitable remedies.

At the trial, the Court granted DBSI the right to file an amended proof of claim, and the parties agreed that the trial would be dispositive of all claims set forth therein. At the conclusion of the plaintiff's evidence, the defendant moved for directed verdict and the Court took the motion under advisement. At the conclusion of the trial, the plaintiff requested that this Court consider its earlier motion for summary judgment as a motion for a directed verdict. The Court took the entire matter under advisement including each party's motion for a directed verdict as well as the plaintiff's motions to strike portions of the defendant's answer and for sanctions.

In December 1985, LCS Homes, through Bruno Figliuzzi, (hereinafter "Figliuzzi"), its president and chairman of the board, agreed to sell to John Driggs, or his assigns, two parcels of land, one containing a modular home manufacturing plant ("the plant") and the other containing 228 acres of undeveloped land. The entire agreement included three documents consisting of two typed contracts and one wire mailgram ("the December 1985 contract"). The wire mailgram identified February 28, 1986 as the date for closing "unless otherwise agreed to by both parties." As consideration for the purchase, the purchaser agreed to assume the industrial revenue note already on the property. However, the assumption was subject to a condition precedent, specifically the approval of Citibank, N.A., the noteholder. The condition precedent reads as follows:

CONTINGENCIES: This Agreement is expressly made contingent upon [the assumption of the aforesaid balance due on the $6,000,000.00 Industrial Development Revenue Note (LCS Homes, Inc. Facility) 1983 Series A owned by Citibank N.A.], the written consent of Citibank N.A. to said purchase and assumption, the approval by the Industrial Development Authority of Stafford County, Virginia, of said conveyance and assumption of its $6,000,000.00 Industrial Revenue Note (LCS Homes, Inc. Facility) 1983 Series A and the preparation and approval by the parties hereto, Citibank, N.A., and the documents effecting the conveyance and the assumption of the Industrial Revenue Bond.[1]

In January of 1986, Driggs, as purchaser, contacted Citibank seeking its approval of the assumption. Subsequently, Figliuzzi, as seller, contacted Citibank to discuss its approval of the assumption. By late January, Citibank still had not approved the assumption. On February 10, 1986, Citibank met with Figliuzzi and Driggs "to hammer out a deal." Those in attendance at the meeting were three Citibank representatives, Figliuzzi, John Driggs and two other representatives of The Driggs Corporation.[2] At this meeting, Driggs and his corporation, offered to put up certain collateral in order to secure Citibank's approval of its assumption of the industrial revenue bond. However, the collateral that Driggs offered was not acceptable to Citibank. Figliuzzi testified that "when it seemed that John Driggs and Citibank had come to an impasse.... I finally offered that, if it would make a difference, I would give them a personal $500,000 guarantee[.]" It appears from the testimony and other evidence that he intended this to be a "shortfall" guarantee. Figliuzzi then testified that the parties set a date for settlement in "mid-March after the hearing[3] ...

1. Each of the typed contracts provided that "[t]his Agreement shall be construed according to the laws of the Commonwealth of Virginia."

2. The Driggs Corporation is an affiliate of DBSI. DBSI had not been formed at the time of the meeting with Citibank. DBSI was incorporated on February 17, 1986 for the pur-

poses of operating the LCS Homes facility. On March 13, 1986, John Driggs assigned all of his right, title and interest under the LCS contract to DBSI.

3. The hearing referred to was a hearing before the Industrial Revenue Bond Authority in

as soon after the hearing as we can[.]" On February 12, 1986, Ronald DePaolo of Citibank recorded in a memorandum the agreement that had been reached at the February 10, 1986 meeting. The DePaolo memorandum did not mention any closing date.

The original closing date of February 28, 1986, as set forth in the December 1985 contract, passed with no attempt to close by the parties. On March 13, 1986, John Driggs assigned all of his right, title and interest under the December 1985 contract to DBSI. On March 17, 1986, two Citibank representatives, Alan Peters and Ronald DePaolo, wrote a letter to Figliuzzi and Driggs reciting the "agreement in principle" that had been reached at the February 10 meeting with still no mention of a closing date. The letter repeated the same terms as the February 12 memorandum and added an additional term, that Figliuzzi provide collateral for his shortfall guarantee. Initially, Figliuzzi rejected this request but, eventually on March 25, 1986, agreed to provide collateral for the guarantee. Figliuzzi wrote a letter on April 10, 1986 to Ronald DePaolo in which he refers to the March 17 letter and explains that at the February 10 meeting, he did not agree to collateralize his guarantee, but that he now agrees to provide collateral. In his letter, Figliuzzi makes no mention of a closing date. Citibank subsequently asked Figliuzzi for additional collateral but, in spite of the demands, Figliuzzi never agreed to provide additional collateral.

A series of letters between DBSI and Citibank show that the parties discussed the terms of the contract with different projected dates for closing. Initially, on April 8, 1986, Reginald Burner of DBSI wrote to Alan Peters of Citibank and stated in his letter,

[t]he conclusion of this deal has dragged on longer than anticipated. Closing on April 18 is essential. We will be prepared, and it is requested that Citibank do the same. If we need to send our attorney to New York to help wrap it up, we stand ready.

Stafford County for approval of the assump-

On April 9, 1986, Lewis Morse, counsel for DBSI, wrote a letter to Barbara Vrancik, counsel for Citibank, in which he stated, "[w]e remain hopeful that all documentation can be executed and delivered by April 18, the target date which was established sometime ago." And finally, on April 18, 1986, Lewis Morse, counsel for DBSI, wrote to Paul Scott, the settlement attorney, and Barbara Vrancik, counsel for Citibank, declaring, "[as] I have previously indicated, it is essential to us that this transaction be concluded prior to May 1, 1986, with everyone's cooperation, this can be accomplished." None of these letters were delivered to Figliuzzi. In his testimony, Figliuzzi stated, "[e]very time I asked, they gave me different dates of closing."

Ultimately, the parties did not close the contract. DBSI, the purchaser and assignee, was ready and willing to go forward with the deal. Notably, Figliuzzi, as representative of the seller, testified, "[DBSI was] trying to help close the deal: there was no question about it, that [DBSI] was in contact with [Citibank]." On April 15, 1986, Citibank, through its attorney sent a proposed guarantee to DBSI and the settlement attorney. On April 17, the settlement attorney and attorneys for Citibank and DBSI discussed by way of a conference call the assumption agreement, deed of assumption, consent agreement, collateral deed of trust and the guarantee. However, also on April 17, 1986, Figliuzzi met with Reginald Burner of DBSI and told Burner that he wanted out of the deal. Burner replied that Figliuzzi should not expressly cancel, but instead expressly give notice to Citibank and Driggs that he is not willing to give any additional collateral for the guarantee and that if the matter is not closed by April 30, 1986, he will then consider Citibank in breach. Instead, on April 21, 1986, Figliuzzi wrote a letter stating that he was cancelling the agreement. Figliuzzi then offered, through a phone call on April 25, a letter on April 28, and a meeting on April 29, 1986, a new agreement for the sale and assumption. DBSI, as purchaser, did not consent to a new contract, choosing to stand by the previous

tion.

agreement. Consequently, the parties did not close the contract.

In addition to the contract for the sale of property, LCS Homes, through Figliuzzi, claims it entered into an oral occupancy agreement for the operation of the plant with John Driggs on behalf of DBSI. The parties never reduced the agreement to writing. The testimony at trial is conclusive that Driggs was to occupy, operate and assume the carrying charges of the plant. However, there is conflicting testimony regarding whether payment of the carrying charges was conditioned upon settlement of the underlying sale contract for the plant and the land.

On May 9, 1986, DBSI filed suit against LCS Homes for specific performance of the contract for the sale of the land and plant in the Circuit Court of Stafford County, Virginia, Chancery No. 325–86. LCS Homes then filed for Chapter 11 relief in this Court on November 3, 1986, which stayed the specific performance action. The debtor filed a complaint for declaratory judgment on February 2, 1987 and, prior to the trial on the merits, the debtor-in-possession sold the plant, surrounding property, and house to John Driggs for $5,750,000 at a court-ordered auction.

■ Although DBSI attempted to resolve the instant contract dispute by filing a complaint for specific performance in state court, the parties have agreed that this Court has jurisdiction over the debtor's declaratory judgment complaint and all of the counterclaims pursuant to section 157 of title 28 of the United States Code.[4] Pursuant to section 157, the Court has jurisdiction over "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1) (1984). Core proceedings include matters concerning the administration of the estate, as well as the allowance and estimation of claims or interests for the purposes of confirming a plan under chapter 11. 11 U.S.C. § 157(b)(2). The debtor's complaint for declaratory relief and for contract damages clearly addresses matters affecting the administration of the estate, in that it seeks a declaration that the estate is not liable to DBSI, John Driggs or Robert Fletcher for breach of contract and, in addition, seeks a judgment in its favor for damages for breach of an occupancy agreement. The defendants' counterclaims are unresolved claims against the estate. All of these items fall within the ambit of section 157 of the Code. See In re NTW, Inc., 69 B.R. 656, 657–58 (Bankr.E.D.Va.1987); In re Johns–Manville Corp., 52 B.R. 879, 890 (Bankr.S.D.N.Y.1985).

■ Turning now to the cross-motions for directed verdict, we find that the evidence at trial demonstrated the following issues to be in dispute: (1) whether or not the contract for the sale of land and sale of the plant had been modified, (2) if a new agreement for such sale had been reached, (3) had a closing date been agreed upon and, if so, had it had been breached, (4) was the purchaser ready, willing and able to meet the purported agreement and, finally, (5) what terms, if any, had been agreed upon by the parties regarding occupancy of the plant. Because these material issues remained in dispute at the conclusion of the trial, a directed verdict is inappropriate. Accordingly, the motions of both parties for directed verdicts are hereby denied. See SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1277 (8th Cir.1981) (motion for directed verdict inappropriate where the evidence supports more than one reasonable

---

4. Generally, actions for declaratory judgment are limited to an adjudication of the parties' rights. See 28 U.S.C. § 2201 (1978). The plaintiff/debtor in the instant case, however, seeks to have this Court declare that the defendant/DBSI breached the contract, and the defendants have filed counterclaims which address the merits of the contract dispute. In consideration of the fact that the parties have presented a substantial controversy, and that a resolution of the issues presented will settle the controversy, and that the pending state court action is not a more efficient forum and, further, that the resolution of this conflict is important to the administration of the debtor's estate, we have exercised our discretion to retain jurisdiction over the instant complaint as a declaratory judgment complaint and the corresponding counterclaims. See In re Hartley, 39 B.R. 281, 284 (Bankr.N.D.Ohio 1984); see generally 6A J. Moore and J. Lucas, Moore's Federal Practice, ¶ 57.10 (2d ed. 1987).

conclusion); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 841 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976) (one instance where motion for directed verdict is appropriate is where there are no controverted issues of fact upon which reasonable minds could differ); *Pogue v. Retail Credit Co.,* 453 F.2d 336, 338 (4th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 910, 34 L.Ed.2d 689 (1973) (motion for directed verdict appropriate if no controverted issues upon which reasonable men could differ).

## I. Contract for Sale of Manufacturing Plant and Land

### A. Breach

The plaintiff asserts that the defendant, DBSI, breached the contract by failing to perform a condition precedent and by failing to close on the contract, that the contract was not modified on February 10, 1986 because the modification was not supported by consideration and, finally, that the modifications of February 10 are void under the Statute of Frauds. DBSI responds by asserting that it was excused from performance by the plaintiff's repudiation of the contract, that the contract was modified at the February 10 meeting and that the modifications are not void under the Statute of Frauds.

■ "A condition precedent calls for the performance of some act, or the happening of some event after the terms of the contract have been agreed upon, before the contract shall take effect." *Morotock Ins. Co. v. Fostoria Novelty Glass Co.,* 94 Va. 361, 365, 26 S.E. 850, 851 (1897); *see M.K. Metals, Inc. v. Container Recovery Corp.,* 645 F.2d 583, 588 (8th Cir.1981) (a condition precedent is any fact or event, subsequent to the making of a valid contract, which must exist or occur before a right to immediate performance can arise under the contract) (quoting 3A A. Corbin, *Corbin on Contracts* § 628 (1960); *United Corp. v. Reed, Wible & Brown, Inc.,* 626 F.Supp. 1255, 1268 (D.V.I.1986); *Matter of Matthieson,* 63 B.R. 56, 59 (D.Minn.1986) (citations omitted). A condition precedent is distinguishable from a promise, in that it

creates no rights or duties in and of itself but is merely a limiting or modifying factor. *Matthieson,* 63 B.R. at 59 (quoting S. Williston, *A Treatise on the Law of Contracts,* § 663 (3d ed. 1961); *In re Lee,* 35 B.R. 663, 665 (Bankr.N.D.Ohio 1983) (same); *cf. Morotock Ins. Co.,* 94 Va. at 365–66, 26 S.E. at 852 (a warranty differs from a condition precedent in that a warranty undertakes that a certain condition of a thing exists when contract is made, whereas enforcement of contract is not possible until condition is fulfilled). The failure of a condition is not a breach of contract, but it discharges the liability of the promisor whose obligations on the contract never mature. *See Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 696 F.2d 359, 363 (5th Cir.1983) (absence or non-occurrence of a condition precedent is a "defense" in an action brought against promisor for breach of his promise) (quoting 3A A. Corbin. *Corbin on Contracts* § 655 (1960)).

■ Conditions to a contract, however, must be waived or performed. *See Winn v. Aleda Constr. Co.,* 227 Va. 304, 307, 315 S.E.2d 193, 195 (1984). Where a contract provides for the performance of conditions precedent, the conditions precedent must be performed before payment is due unless the party relying upon the condition prevents or waives the performance. Restatement (Second) of Contracts § 225 (1981); *see Winn v. Aleda Constr. Co.,* 227 Va. 304, 307, 315 S.E.2d 193, 195 (1984). A refusal to perform or a repudiation of the contract will excuse the other party from making tender. *Two–Way v. GWETA,* 206 Va. 110, 116, 141 S.E.2d 742, 746 (1965) (citations omitted); *see In re Scott,* 82 B.R. 760, 761 (Bankr.E.D.Pa.1988) ("A party who prevents performance also excuses performance."). A party to a contract is under a duty not to prevent performance by the other party. *Matter of Vecco Constr. Indus., Inc.,* 30 B.R. 945, 949 (Bankr.E.D.Va.1983) *modified,* 33 B.R. 757 (Bank.E.D.Va.1983); *see In re Roman Crest Fruit, Inc.,* 35 B.R. 939, 946 (Bankr. S.D.N.Y.1983) (when contractual duty is conditional, good faith and fair dealing re-

quire promisor to cooperate by refraining from conduct which would prevent or hinder the occurrence of the condition); *Whitt v. Godwin*, 205 Va. 797, 800, 139 S.E.2d 841, 844 (1965) (noting implied condition of every contract that one party will not prevent performance by other party).

When one party to a contract has entirely abandoned it, or has absolutely refused to perform it, the other party may elect to sue on it without waiting for the time of performance to arrive. *Board of Supervisors of Fairfax County v. Ecology One, Inc.*, 219 Va. 29, 33, 245 S.E.2d 425, 428 (1978); *Two–Way Tronics*, 206 Va. at 116, 141 S.E.2d at 746; *Simpson v. Scott*, 189 Va. 392, 397, 53 S.E.2d 21, 23 (1949). The cause of action for abandonment of a contract obligation is an anticipatory breach. *Board of Supervisors*, 219 Va. at 33, 245 S.E.2d at 428. "[Under] the doctrine of anticipatory breach, ... if one party to a contract declares in advance that he will not perform at the time set for his performance, the other party may bring an immediate action for total breach of the contract." *City of Fairfax, Va. v. Washington Metro. Area Transit Authority*, 582 F.2d 1321, 1325 (4th Cir.1978), *cert. denied*, 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979); *United Corp.*, 626 F.Supp. at 1257; *see Bill's Coal Co. Inc. v. Bd. of Pub. Utilities*, 682 F.2d 883, 886 (10th Cir.1982), *cert. denied* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983) ("A repudiation is a party's manifestation that it is not going to provide those goods or services when they will be due at some future date."); *Mutual Reserve Fund Life Ass'n v. Taylor*, 99 Va. 208, 213, 37 S.E. 854, 855–56 (1901). The repudiation must be clear and unequivocal, and it must cover the entire performance of the contract. *Link v. Weizenbaum*, 229 Va. 201, 203, 326 S.E.2d 667, 668 (1985).

It has long been recognized that the terms of a contract may be waived by the subsequent acts and conduct of the parties. *See John H. Maclin Peanut Co. v. Pretlow & Co.*, 176 Va. 400, 410–11, 11 S.E.2d 607, 611 (1940) (observing when parties deliberately and mutually disregard plain terms of contract, plain rights have been waived); *Gurney Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 334 F.Supp. 845, 851, 852 (W.D.N.C.1971) (by failing to terminate the agreement and permitting contractor to continue work, parties waived mutuality of time condition). Where parties to a contract continued to perform the terms and conditions of the agreement after the expiration date, the parties waived the contract term requiring a written extension. *See United States v. Stack*, 308 F.Supp. 46, 50 (E.D.Va.1968) (permitting party to continue work on project after "completion date" amounted to waiving the time requirement), *aff'd*, 420 F.2d 698 (4th Cir.1970); *Goldstein v. Old Dominion Peanut Corp.*, 177 Va. 716, 725, 15 S.E.2d 103, 106 (1941) (where plaintiff failed to complete delivery by date specified in contract, but continued deliveries past such date, and parties wrote seven letters back and forth without suggesting that original date was essential, court held an unequivocal waiver of contract terms of delivery); *Reid v. Field*, 83 Va. 26, 33, 1 S.E. 395, 398–400 (1887) (accepting a substituted performance and subsequent promise of a purchase constituted waiver of previous default).

Parties may modify an existing agreement by mutual assent. *Keco Indus., Inc. v. ACF Indus., Inc.*, 316 F.2d 513, 516 (4th Cir.1963); *Hotchner*, 163 F.2d at 676; *Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 72; 306 S.E.2d 870, 873 (1983). In order to accomplish a modification, the altered agreement should be supported by consideration. *See Stanley's Cafeteria*, 226 Va. at 73, 306 S.E.2d at 873 (1983) (party asserting modification must prove either passage of valuable consideration or consideration substitute).

Finally, under the Statute of Frauds, a contract required to be in writing may satisfy this requirement through a series of writings setting forth the essential terms of the contract. *Drake v. Livesay*, 231 Va. 117, 121, 341 S.E.2d 186, 188 (1986); *see In re F & S Cent. Mfg. Corp.*, 70 B.R. 569, 576 (Bankr.E.D.N.Y.1987). The Statute of Frauds does not require that the whole contract be in writing, only

that a memorandum or note or series of notes contain the essential terms and be signed by the party to be charged thereby. *Reynolds v. Dixon*, 187 Va. 101, 106, 46 S.E.2d 6, 9 (1948); *see Rahm v. Klerner*, 99 Va. 10, 14, 37 S.E. 292, 293 (1900). That is, a memorandum is sufficient if it contains or makes reference to some other writing containing the names of the parties, the terms of the contract and a description of the property sufficient to render it capable of identification. *Reynolds*, 187 Va. at 108, 46 S.E.2d at 8, 9; *Rahm*, 99 Va. at 13–14, 37 S.E. at 293–94.

Applying the above rules of construction to the instant case, it is clear that DBSI did not breach the contract by an anticipatory repudiation. To sustain a finding that DBSI is guilty of anticipatory breach, LCS must show that DBSI refused to perform its duty under the condition precedent.

■■■ Instead, we find that the plaintiff has confused the concept of a condition precedent with a contractual promise. By the clear language of the contract, the defendant purchaser did not promise to secure the approval of the noteholder, Citibank, N.A., but rather promised to assume the obligation under the note. Citibank approval of the assumption was a condition precedent. As stated above, a condition precedent is an event, which must exist or occur before a right to immediate performance arises under the contract. The nonoccurrence of a condition precedent relieves the parties of their contractual liabilities unless the nonperformance was caused by one of the parties to the contract. The plaintiff not only failed to establish that DBSI clearly and unequivocally refused to perform under the contract, but a representative of the plaintiff testified that DBSI was at all times "trying to close the deal[,]" which is in effect evidence of

DBSI's good faith efforts. Moreover, the evidence clearly shows that the plaintiff memorialized its refusal to complete performance of the contract in a letter. It is the plaintiff, therefore, who repudiated the contract and prevented the condition precedent from occurring.

■■■ Furthermore, the plaintiff's own evidence shows that the meeting of February 10, 1986 resulted in a modification of the December 1985 contract. The evidence indicates that new terms were added to the December 1985 contract requiring certain collateral on the part of both the purchaser and the seller in order to secure the approval of the noteholder to the assumption arrangement. The plaintiff testified that in order to resolve the impasse between Citibank and Driggs, and thus secure Citibank's approval of the assumption which would ultimately relieve him of personal liability, he agreed to a shortfall guarantee.[5] Hence, the consideration for Figliuzzi's new promise was Citibank's promise to approve the bond assumption. Thus, the December 1985 contract was indeed modified.

■■■ Furthermore, not only has the plaintiff failed to show that a specific date for settlement was agreed upon but, by its own testimony, has shown that the closing dates kept changing. The evidence is clear that the parties ignored the February 28, 1986 closing date in the original contract, and that the matter was not brought to issue until this litigation. The facts conclusively establish that the parties waived the February 28, 1986 closing date.[6]

■■■ Finally, the plaintiff has failed to demonstrate that the modification was void under the Statute of Frauds. On the contrary, the plaintiff's evidence indicates that the agreement was recorded in several

---

**5.** Whether Figliuzzi, on behalf of LCS Homes, agreed to collateralize the shortfall guarantee at the February 10, 1986 meeting is irrelevant. Figliuzzi testified that he did in fact agree in writing to collateralize his shortfall guarantee in a letter dated April 10, 1986. This is corroborated by the April 10th letter in evidence. Plaintiff's Exhibit 40, Defendant's Exhibit DD.

**6.** The plaintiff argues that time was of the essence and, therefore, the defendant's failure to meet the condition precedent and its failure to settle was a breach. As stated above, we find that the plaintiff prevented the condition precedent from occurring, and that the plaintiff waived the contract closing date. These circumstances contradict the assertion that time was of the essence.

memorandums and letters which set forth the essential terms of the contract. In fact, the plaintiff's own letter of April 10, 1986 refers to a letter dated March 17, 1986 that identifies the property that is the subject of the contract, the consideration, and the condition precedent. The April 10, 1986 letter is signed by Figliuzzi as representative of the seller, LCS Homes, and the March 17, 1986 letter is signed by a representative of Citibank. Therefore, we find that the modification agreement of February 10, 1989 is valid under the Statute of Frauds.

■ Additionally, the plaintiff raises the argument that the defendant waived its legal and equitable remedies. In its brief, the plaintiff stated "that the parties waived all rights and remedies at law[,]" and cites the following excerpt from the contract as support for the proposition.

Default. In the event of a default under this contract by Purchaser, the Purchaser shall forfeit deposit hereunder to the Seller and this contract shall thereby become null and void, all of the other rights and remedies of the parties hereto at law being hereby expressly waived.

The plaintiff's reliance on the above paragraph is misplaced. The clause applies "in the event of a default under this contract by the purchaser." As stated above, we find that there was no default in that the purchaser did not breach the contract. Therefore, the plaintiff has failed to establish that the defendant purchaser waived its legal remedies.

The plaintiff argues also that the defendant waived its equitable remedies by not pursuing an adversary proceeding for specific performance in this Court. However, even if this were true, it would be of no consequence given the fact that the defendant is not pursuing any equitable remedies under the written contract.

Based on the foregoing, we find that the defendant did not breach the contract of sale. We further find that the contract was modified and is valid under the Statute of Frauds.

### B. John Driggs

The plaintiff has brought this suit against both DBSI and John Driggs. John Driggs entered into the contract with LCS Homes and, subsequently, assigned the contract to DBSI.

■ It is well established that a party to a contract cannot relieve himself of the contract obligations merely by assigning the contract to a third party. 6 Am.Jur.2d *Assignments* § 110 (1963); *see Marriott v. Harris*, 235 Va. 199, 222, 368 S.E.2d 225, 237 (1988) (citing Va.Code Ann. § 8.2–210(4)). Generally, the assignor remains liable as a surety. *See Strauss v. Stratojac Corp.*, 810 F.2d 679, 684 n. 4 (7th Cir.1987); *Rock–Ola Mfg. Corp. v. Wertz*, 249 F.2d 813, 815 (4th Cir.1957) (dicta); *Imperial Refining Co. v. Kanotex Refining Co.*, 29 F.2d 193, 200 (8th Cir.1928); *see also Marriott v. Harris*, 235 Va. at 222, 368 S.E.2d at 237.

■ In this case, the plaintiff offered no proof against John Driggs individually, other than his liability as assignor. As shown above, we find that the plaintiff anticipatorily breached the contract, and that the plaintiff prevented the condition precedent from occurring. For these reasons, we find that both the assignee and assignor are relieved of liability on the contract. Furthermore, the assignor cannot be held liable when, in fact, the assignee did not breach the contract.

### C. Damages

■ In its effort to prove damages as the loss of the bargain, DBSI offered alternative valuations. First offered was the difference between the auction sale price and the contract price as the measure of the loss of the bargain. Alternatively, DBSI offered the difference between the value at the time of the breach and the contract price. We hold that the loss of the bargain should be determined by the difference between the sale price at the auction and the contract price.

The defendant offered the testimony of its chief financial officer, Reginald Burner, to show the difference between the auction

price and the contract price. Burner testified that the auction price was $5,750,000, and that this figure included a house and 3 acres not included in the original sale contract. A real estate appraiser, qualified as an expert for real estate valuations, testified as to the value of the house and the three acres. After reducing the auction price by the appraiser's value for the house and the three acres, Burner testified that the net actual purchase price at the auction was $5,595,000. The original contract price for the same property was 4,200,000. The difference between these figures amounts to $1,395,000.

Burner also testified to a difference in interest payments under the two different contracts, the original contract at a rate of $\frac{3}{4}\%$ for the interest on the bond for the property, and the auction sale having an interest rate of prime for the property. His testimony was based on a computer amortization of the interest under the two rates and showed that under the original contract, the interest payments for the remaining life of the bond would amount to $1,538,081, and under the auction sale contract the interest payments will amount to $2,072,177. The difference between these two figures is $534,096.

In Virginia, the measure of damages for breach of contract by the seller of a contract to convey real property is the return of purchase money actually paid unless the purchaser can show that the vendor willfully refused to convey. *In re James R. Corbitt Co.*, 48 B.R. 937, 942 (Bankr.E.D. Va.1985); *Horner v. Holt*, 187 Va. 715, 727–29, 47 S.E.2d 365, 371 (1948); *Davis v. Beury*, 134 Va. 322, 339–40, 114 S.E. 773,

777–78 (1922). Where the purchaser shows that the seller's breach was willful, the measure of damages is the loss of the bargain. *Horner*, 187 Va. at 728, 47 S.E.2d at 371.

Under the stated principles, the defendant is entitled to damages for the loss of its bargain. The loss of the bargain in this case is the difference between the auction sale price and the contract price.[7] The defendant has shown its loss as $1,395,000 amounting to the difference in the sale price figures, plus an additional $534,096 for the loss of the interest rate benefit. Accordingly the plaintiff is liable to the defendant in the amount of $1,929,096.

## II. Occupancy Agreement

LCS Homes claims that it entered into an oral agreement with John Driggs on behalf of DBSI for the occupancy of the plant, prior to the settlement of the contract for sale of the plant and land. Further, LCS Homes claims that DBSI breached the agreement and therefore is liable to LCS Homes for damages. Specifically, LCS Homes asserts that under the occupancy agreement, DBSI was to pay the carrying charges for the operation of the plant, regardless of whether or not the contract eventually settled and, therefore, LCS Homes seeks damages for the amount of carrying charges for the period that DBSI occupied the plant. DBSI denies that this was the agreement. Instead, it argues that the agreement was conditioned upon settlement of the underlying sale of the plant and land. DBSI argues that it only agreed to pay the carrying charges as a

---

7. *See In re F & S Cent. Mfg. Corp.*, 70 B.R. 569, 577 (Bankr.E.D.N.Y.1987) (damages best determined as difference between price actually received and contract price). The Virginia Supreme Court has held that the measure of damages for a seller's refusal to convey or a seller's breach of a contract for the sale of land is the difference between the contract price and the value of the land on the date of breach. *Williams v. Snider*, 190 Va. 226, 230–34, 56 S.E.2d 63, 66 (1949); *Horner*, 187 Va. at 728, 47 S.E.2d at 371 (1948); *Davis*, 134 Va. at 340, 342, 114 S.E. at 377–78 (1922). However, in the cases cited, the nondefaulting purchaser did not purchase the property after the breach. There-

fore, there was no proof of a value of the property other than the estimation of the value at the time of the breach. Here, we have proof of market value through the sale price that the purchaser ultimately paid for the property at a public auction. The sale price is a better determination of value than an appraiser's estimated value at the time of breach. *Cf. Barr v. MacGlothlin*, 176 Va. 474, 476, 11 S.E.2d 617, 620 (1940) (general rule applicable to breach by vendee of executory agreement to purchase land where there is subsequent resale by vendor ordinarily is difference between contract price and market value; resale amount is prima facie evidence of market value).

debit against the purchase price on the date of settlement.

The only evidence of the occupancy agreement was the testimony of Figliuzzi on behalf of LCS Homes and Burner on behalf of DBSI. Figliuzzi testified that under the agreement, "[t]hey were to pay the ongoing bills.... When they were due for me, they were due for them." When questioned as to whether the agreement was in fact that the carrying charges or bills were to be paid only in the event of settlement, Figliuzzi responded, "[T]hat's what [DBSI] wanted. But that wasn't what I agreed to." Also, when asked whether Figliuzzi believed that there was an agreement at all, he responded, "[w]e had an agreement on occupancy, I thought."

Burner testified in connection with the occupancy agreement that "[t]he idea was that we would pay for the carry on the plant and the incidental expenses that a tenant would pay, but it was predicated on settling on the deal." When questioned as to whether there was a misunderstanding as to which carrying charges were to be paid, Burner answered, "[n]ot really."

■ Meeting of the minds or mutual assent to the terms is a basic requirement for the formation of a contract. *In re Taco Eds. Inc.*, 41 B.R. 693, 695 (Bankr.N.D. Ohio 1984); *In re Jay's Trucking Co., Inc.*, 26 B.R. 73, 76 (Bankr.E.D.Va.1982); *see Charbonnages de France v. Smith*, 597 F.2d 406, 417 (4th Cir.1979); *Green's Ex'rs v. Smith*, 146 Va. 442, 452, 131 S.E. 846, 848 (1926). In order to achieve a meeting of the minds there must be both an offer and acceptance of the contract's provisions. *In re Taco Eds*, 41 B.R. at 695 (citations omitted); *King Lumber Co., Inc. v. National Bank of Summers*, 286 F. 906, 907 (4th Cir.1923). *Green's Ex'rs*, 146 Va. at 452, 131 S.E. at 848. Both parties must have a clear understanding of terms of agreement and intention to be bound thereby before an enforceable agreement is created. *In re Taco Eds*, 41 B.R. at 695; *see Smith v. Farrell*, 199 Va. 121, 128, 98 S.E.2d 3, 7–8 (1957) (quoting 17 C.J.S. Contracts § 31). In *Smith v. Farrell*, the Vir-

ginia Supreme Court noted that "[a]n uncertain contract is one which may, indeed, embrace all material terms, but one of them is expressed in so inexact, indefinite or obscure language that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect." 199 Va. at 128, 98 S.E.2d at 7.

■ In the instant case, we cannot find from the evidence that there was a meeting of the minds with respect to the occupancy agreement. While the parties may have agreed what the carrying charges entailed, it is clear that Figliuzzi did not agree to the conditional payment arrangement as described by Burner. The lack of agreement on a material term, the time at which DBSI became responsible for assuming the carrying charges, leads this Court to conclude that there was no meeting of the minds and there was no express contract.

■ If, under the facts of a case, a court cannot find a meeting of the minds and thus a contract, a court may apply the equitable concept of unjust enrichment. *In re MBA, Inc.*, 51 B.R. 966, 974 (Bankr.E.D. Va.1985). A court may find a quasi-contract and enforce payment to avoid unjust enrichment. *Id.*; *see Rinehart v. Pirkey*, 126 Va. 346, 351, 101 S.E. 353, 354 (1919) (defining quasi-contract).

We therefore examine the counterclaim on the basis of quasi-contract and *quantum meruit*. At trial, LCS Homes attempted to show damages during the period of occupancy in the form of bills paid, interest accumulating on the bond to Citibank, and the value of the LCS Homes materials used by DBSI during their period of occupancy. Figliuzzi testified to an inventory report showing damages to LCS Homes in the total amount of $600,000. Also at trial, Burner testified to DBSI's damages during the period of occupancy. Burner testified that DBSI experienced a loss while they occupied the plant. Referring to a chart prepared for the purposes of the proof of claim in the LCS Homes reorganization, Burner stated that the loss for operating the plant amounted to $129,-000. Reducing that amount by the attorney's fees in connection with the litigation

and the profits earned while operating the plant, Burner testified to a net loss of $88,813. During cross-examination, Burner agreed that the $88,813 figure should be reduced by an additional $74.50 for additional legal fees.

LCS Homes argues that it experienced losses in the amount of $600,000 for the period that DBSI occupied the plant. However, LCS Homes failed to prove that DBSI received enrichment during its occupancy of the plant. Instead, LCS could not refute DBSI's evidence regarding its losses. DBSI, on the other hand, has asserted that it had losses during the period of occupancy and that it should be allowed to recover these losses from LCS Homes. DBSI established that the losses were in the form of start-up expenses and implied that they would not have had such expenses but for the occupancy agreement. Therefore, arguing that LCS Homes breached the occupancy agreement, they claim that they are entitled to a return of their start-up costs. DBSI does not offer support for its argument.

■ In sum, it is clear the parties did not have a meeting of the minds or mutual assent regarding a contract for the occupancy of the plant. In addition, neither party sufficiently proved the existence of an occupancy agreement. Had LCS Homes shown that DBSI was unjustly enriched or received a benefit for which it did not pay, this Court could grant restitution, that is, a return of the enrichment or benefit. However, LCS Homes showed that it experienced damages but could not show that DBSI experienced enrichment. Under these circumstances, it is clear that LCS Homes may not recover restitution damages. Finally, DBSI asserts in its proof of claim an amount for the start-up expenses during the occupancy of the plant. However, the evidence does not support its theory that LCS Homes breached the occupancy agreement, nor does it support the claim that LCS Homes is liable to DBSI for the start-up costs.

## III. Counterclaim of Intervenor Robert Fletcher

Robert Fletcher alleges in a counterclaim that he had an employment contract with LCS Homes, that the contract provided for a 1% sales commission to be paid to Fletcher for any properties sold by LCS Homes during Fletcher's employ, that all such sales must close in order to earn the commission, that Fletcher procured The Driggs Corporation as a buyer for LCS Homes' property, that LCS Homes entered into a contract for sale of the modular home industrial plant and 225 acres of surrounding undeveloped land with John Driggs, president of The Driggs Corporation, that LCS then prevented the sale from closing, that LCS cannot claim the failure of a closing as an excuse for not paying the commission, and finally, that Fletcher should be awarded a 1% commission on the original sale price in the contract as entered into between LCS Homes and John Driggs.

■ Fletcher's claim must be denied because of his failure to plead or prove that he held a real estate license. Under Virginia law, one must hold a real estate license in order to recover a commission. *See* Va. Code Ann. § 54.1–2106 (1988) and Va.Code Ann. § 54.1–2107 (1988). Va.Code Ann. § 54.1–2106 states "[n]o person ... shall act as a real estate broker or real estate salesperson ... or assume to act as a real estate broker or real estate salesperson without a license issued by the Real Estate Board." The Code defines "broker" as "any person ... who, for compensation or valuable consideration (i) sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate[.]" Va.Code Ann. § 54.1–2100 (1988). One single act as a "broker", defined above, constitutes one as a real estate broker or real estate salesperson. Va.Code Ann. § 54.1–2107 (1988). Under the relevant cases interpreting Virginia law, a contract for the payment of compensation to an unlicensed broker or salesman for services rendered as such is not merely unenforceable; it is void. *Wickersham v. Harris*, 313 F.2d 468, 471 (10th Cir.1963); *Massie v. Dudley*, 173 Va. 42, 51, 3 S.E.2d 176, 180 (1939). The rationale appears to be that to permit such a person to recover

would in effect dilute the statutes and take from them much of the protection of the public interest they are designed to provide. *Wickersham*, 313 F.2d at 471; *see Massie v. Dudley*, 173 Va. 42, 55, 3 S.E.2d 176, 181 (1939) (statutes requiring brokers and salesmen to procure a license before acting as such are designed to protect the public from the fraud, misrepresentation and imposition of dishonest and incompetent persons).

As counterclaim plaintiff, Robert Fletcher had the burden to prove, by a preponderance of the evidence, the essential elements of his claim entitling him to a commission. He has not done so, consequently, his claim for a commission must be denied.

IV. Plaintiff's Motions for Sanctions and to Strike Paragraph of Defendant's Answer to the Amended Complaint.

A. Motion For Sanctions

██ Prior to the date set for trial, the plaintiff, LCS Homes, Inc., moved this Court to impose sanctions upon the defendant, DBSI, for its "refusal to permit discovery with respect to damages." The plaintiff cites the following facts as reasons for its motion. Prior to the trial, during the discovery period, the plaintiff noticed the depositions of John Driggs, Reginald Burner and Lewis Morse, all witnesses for the defendant. The defendant moved to quash notice of the deposition, whereupon, the plaintiff moved for an order to compel the deposition. At the scheduled hearing on these motions held on November 9, 1987, the parties represented to the Court that they had reached a settlement on the discovery dispute. Counsel for the plaintiff represented the settlement as follows:

We have resolved the discovery issues. Mr. Wright [counsel for the defendant] and I have agreed that the deposition of Reginald Burner would be taken for the limited purposes of damages and with respect to the occupancy agreement that is part of the litigation. And we will arrange the deposition[.]

At the deposition, counsel for the plaintiff asked Mr. Burner questions regarding all damages generally. Counsel for the defendant objected on the ground that the agreement settling the discovery dispute limited the questioning to the occupancy agreement and damages in connection to it. The plaintiff's counsel argued that the agreement allowed questioning regarding damages generally and was not limited to the occupancy agreement alone.

Following the deposition, counsel for the plaintiff submitted a proposed order to counsel for the defendant setting forth the agreement with respect to the damage discovery. Counsel for the defendant has not endorsed, modified or opposed the proposed order, nor has counsel for the defendant submitted any response or opposition to the motion. For these reasons, the plaintiff requests sanctions to be imposed against the defendant. Further, the plaintiff moves under Federal Rule of Civil Procedure 37(b)(2)(C) to have the defendant's counterclaim dismissed and supporting documents stricken.

Hearing on the motion was set for the morning of the first day of the trial. The Court postponed argument on the motion until the end of the trial. At the end of the trial, the Court took the motion under advisement.

The plaintiff cites as the basis for its motion Federal Rule of Civil Procedure 37, made applicable to bankruptcy proceedings through Bankruptcy Rule 7037. Federal Rule of Civil Procedure 37 provides for sanctions against parties or persons unjustifiably resisting discovery. The rule authorizes a court to award sanctions, dismiss actions, or strike pleadings for a *"fail[ure] to obey an order to provide or permit discovery,* ... or if a party *fails to obey an order* entered under Rule 26(f), [discovery conference.]"* Fed.R.Civ.P. 37(b)(2) (1987) (emphasis supplied). The plaintiff offers no authority in support of its motion.

The facts as related by the plaintiff do not support its motion. While the plaintiff has established that the deponent failed to answer certain questions at the scheduled deposition, the plaintiff did not move the Court for an order to compel the deponent to answer the questions, and the plaintiff

did not show that the deponent failed to obey such an order of the Court. Rule 37 does not apply to the instant controversy over answering questions at the deposition. Therefore, we deny the plaintiff's request for sanctions.

B. Plaintiff's Motion To Strike Paragraphs of the Defendant's Answer to Plaintiff's Amended Complaint

The plaintiff seeks to have this Court strike portions of the defendant's answer to the plaintiff's amended complaint. Briefly, the procedural background of the motion is as follows. The plaintiff filed a complaint for declaratory relief. The defendant answered and counterclaimed against the defendant for breach of contract. Prior to the trial in this adversary proceeding, the Court granted the debtor-in-possession in the main case leave to sell its manufacturing facility and raw land at an auction. The defendant purchased the facility and the land at the auction. The plaintiff then moved this Court to amend its complaint pursuant to Rule 7015.[8] The Court granted the plaintiff leave to amend its complaint. The defendant filed an answer to the plaintiff's amended complaint. The plaintiff moves this Court to strike certain portions of the defendant's answer to the amended complaint that differ or contradict portions of the answer to the original complaint for declaratory relief.

The defendant in its first answer declared that it is without knowledge or information sufficient to form a belief as to the allegation that at the February 10, 1986 meeting, the parties agreed that the personal guaranty of Bruno Figliuzzi would be unsecured. In its second answer, the answer to the amended complaint, the defendant alleged upon information and belief that Bruno Figliuzzi agreed that the new unsecured personal guarantee would be secured or collateralized in a manner acceptable to Citibank. The plaintiff argues that under the principle of *Massie v. Firmstone*, 134 Va. 450, 114 S.E. 652 (1922), the defen-

dant is bound by its pleadings, and cannot dispute facts that it previously admitted. Accordingly, the plaintiff asks this Court to strike the answers and to enter judgment for the plaintiff.

In *Massie*, the Virginia Supreme Court upheld a judgment where a lower court ruled by considering the party's testimony as a whole, relying on statements from deposition testimony and exhibits. That Court held that if a party's statements as a whole suggest one conclusion, the party is bound by that notwithstanding his inconsistent statements in other evidence. *Massie v. Firmstone*, 134 Va. 450, 462, 114 S.E. 652, 656 (1922). *Massis* stands as a Virginia rule of evidence. Under the rule, a party who testifies to a fact within its knowledge may not controvert this fact through other evidence; that is, one may not rise above one's own testimony where that testimony, if true, would preclude success on the merits. *Utility Control Corp. v. Prince William Constr. Co., Inc.*, 558 F.2d 716, 720 (4th Cir.1977), *see Deskins v. T.H. Nichols Line Contractor, Inc.*, 234 Va. 185, 187–88, 361 S.E.2d 125, 126 (1987).

 The plaintiff's reliance on the *Massie* doctrine is misplaced. The *Massie* doctrine is not a federal rule of pleading or procedure but rather a state commonlaw proposition. Furthermore, the *Massie* doctrine does not apply here. The doctrine applies to taking evidence as a whole in order to determine whether issues are indeed in dispute or whether a party changed its testimony creating a "dispute." Even if we were to apply the *Massie* rule, we would not be compelled to strike because taking the evidence as a whole, the defendant has not attempted to controvert its testimony or answers as shown below.

Under Federal Rule of Civil Procedure 8(b), made applicable to bankruptcy proceedings through Bankruptcy Rule 7008, if a party states that it "is without knowledge or information sufficient to form a belief as to the truth of an averment, . . .

8. Bankruptcy Rule 7015 adopts Rule 15 of the Federal Rules of Civil Procedure. Rule 15 of the Federal Rules of Civil Procedure states that a party may amend their pleading by leave of

court or by written consent of the adverse party, "and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15 (1987); Bankr.R.P. 7015 (1987).

this has the effect of a denial." Fed.R. Civ.P. 8(b) (1987). Some courts construing the rule have held that where a party states it is without knowledge or information to form a belief to matters that are clearly within its knowledge, the averment is not a denial. *See Mesirow v. Duggan,* 240 F.2d 751, 756 (9th Cir.), *cert. denied,* 355 U.S. 864, 78 S.Ct. 93, 2 L.Ed.2d 70 (1957); *see also American Photocopy Equipment Co. v. Rovico, Inc.,* 359 F.2d 745, 746–47 (7th Cir.1966); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.22 at 8–166. In the instant case, we cannot find that the information is clearly within the knowledge of the defendant, and therefore must accept their averments as denials. Therefore, while the defendant has denied certain facts in its first answer, the second answer is not inconsistent because it again denies the allegations.

The defendant does admit that upon "information and belief" that Figliuzzi agreed to collateralize the guarantee. Perhaps the defendant has changed his testimony by first denying any knowledge or information and later asserting knowledge upon "information and belief" of the allegations. Yet, even if this may be grounds to strike the answers, and this Court ruled that the specific answers the plaintiff lists as inconsistent were stricken, there would be no consequence to or effect on the outcome of the case at bar. In either case, allowing the answers or striking the answers, the defendant has denied that Figliuzzi's personal guarantee was to be unsecured. Thus, the security issue is in dispute and the Court could not award summary judgment. The Court would then look to all the evidence at the conclusion of the trial, including the testimony as a whole, and would be compelled to come to the same conclusion.

Pursuant to the foregoing, we find the defendants, John Driggs and DBSI, did not breach the contract for sale of the plant and land, that the contract was modified and is valid under the Statute of Frauds. We find that the plaintiff cancelled the contract for sale of the plant and land, committing an anticipatory breach. We find further that the breach was willful and therefore hold that the plaintiff is liable to the defendant, DBSI, for its loss of the bargain. We also find that the best measure of the defendant's loss of the bargain is the difference between the auction sale price and the original contract price. Accordingly, we hold that the plaintiff is liable to the defendant for $1,929,096 representing the difference between the auction sale price and the original contract price plus an amount for the interest lost.

In addition it is our conclusion that there was no meeting of the minds regarding an occupancy agreement between the plaintiff and the defendants, John Driggs and DBSI. Nor do we find that the defendants were enriched by occupancy and operation of the plant. Accordingly, we deny the plaintiff's request for damages for breach of an occupancy contract.

We hold that the intervenor Robert Fletcher did not prove that he held a real estate license at the time of the contract for the sale of plant and property, and therefore may not recover a real estate commission.

Finally, we deny the plaintiff's motion for sanctions on the grounds that the defendant, DBSI, did not disobey an order of the Court. We deny the plaintiff's motion to strike portions of the defendant's answers on the grounds that under the federal rules, the answers are not inconsistent or contradictory and do not create a dispute which had not previously existed.

An appropriate order will follow.